**Lin ZHONG, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Attorney General Gonzales,\* Respondent.**

**Docket No. 02–4882.**

United States Court of Appeals, Second Circuit.

Argued: May 24, 2005.

Decided: Aug. 8, 2006.

Amended: Jan. 17, 2007.

---

\* Pursuant to Fed. R.App. P. 43(c)(2), Alberto Gonzales, Attorney General of the United States, has been substituted for John Ashcroft as Respondent.

Bruno Joseph Bembi, Hempstead, N.Y., for Plaintiff–Appellant (on submission).

Sara R. Robinson–Glasser, Assistant United States Attorney for the Central District of California, for Debra W. Yang, United States Attorney for the Central District of California (Leon W. Weidman, Assistant United States Attorney, on the brief), Los Angeles, Ca., for Respondent (on submission).

Before KEARSE, CALABRESI, and POOLER, Circuit Judges.

Judge KEARSE dissents in a separate opinion.

CALABRESI, Circuit Judge.

■ The principal issue in this case concerns whether the *mandatory* requirement of issue exhaustion in asylum cases is also *jurisdictional.* The Supreme Court, in *Eberhart v. United States,* 546 U.S. 12, 126 S.Ct. 403, 405, 163 L.Ed.2d 14 (2005) (per curiam), recently cautioned lower federal courts against conflating mandatory with jurisdictional prerequisites to review. We take the Court's caveat to heart. Such a caveat does not, of course, affect the clearly jurisdictional requirement of 8 U.S.C. § 1252(d)(1) that cases of this sort be brought to the Executive Office for Immigration Review (i.e., an IJ and the BIA) before they can be considered by courts of appeal. Nor is it enough to permit a panel of our court to reconsider past holdings that exhaustion of some asylum questions, e.g., claims for relief, is jurisdictional. It is a reason, however, for us to treat as not jurisdictional, though mandatory (and hence waiveable) the requirement of *issue* exhaustion, something as to which our court has spoken, though we believe not definitively held. As will be apparent, the question is determinative of the asylum case before us.[1]

---

1. The government has asked us to reconsider our holding in this case. A majority of this panel declines to do so. In rejecting the request for a rehearing, however, we wish to clarify our position with respect to some matters that the government raises. Specifically,

Petitioner Lin Zhong ("Lin"), a citizen of the People's Republic of China, seeks review of a November 8, 2002 decision of the Board of Immigration Appeals ("BIA"), which summarily affirmed an Immigration Judge's ("IJ") January 31, 2001 denial of Lin's application for asylum and withholding of removal under the Immigration and Nationality Act of 1952(INA), and for relief under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85.[2]

Lin's removal from the United States was first ordered in 1994, following an IJ's determination that, under the then-applicable version of the INA, Lin had failed to establish that he had been persecuted or was likely to be persecuted by the Chinese government on account of his political opinion. But in 1999, Lin, who had not yet been deported,[3] sought and obtained reopening of his application in order to be considered for relief under intervening changes in law—the implementation of CAT and the passage of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), which expanded the INA's definition of political persecution to include some coercive population control programs.[4] *See* 8 C.F.R.

in holding that, though not jurisdictional, issue exhaustion is mandatory, the majority expects that virtually no case will be decided differently from the way it would be were the requirement deemed jurisdictional.

Some examples may be helpful:

(a) If the government points out to the appeals court that an issue relied on before that court by a petitioner was not properly raised below, the court must decline to consider that issue, except in those extraordinary situations in which we have held that such issues can be considered even when exhaustion is a jurisdictional matter. *See, e.g., Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 52–53 (2d Cir.2004) (holding that while exhaustion of administrative *remedies* is a "statutory exhaustion requirement," and hence a failure to appeal was jurisdictional, "in light of the unusual facts of [the case *sub judice* ], an exception is necessary to prevent manifest injustice").

(b) Even if the government does not point out a failure to exhaust an issue before the agency, such a failure to exhaust is sufficient ground for the reviewing court to refuse to consider that issue. In other words, no appeals court is *required* to accept a government waiver of issue exhaustion.

(c) Moreover, even a court that would be inclined to accept a government waiver of issue exhaustion may not do so in the absence of a fully-developed record that would allow review of the unexhausted issues by this court and the BIA without further findings—once again, with the exception of those cases in which such review has been permitted when the exhaustion has been treated as jurisdic-

tional. *See Marrero Pichardo*, 374 F.3d at 52–53.

**2.** Our jurisdiction to hear Lin's petition for review arises under the transitional rules of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA) § 309(c)(1), Pub.L. No. 104–208, div. C, 110 Stat. 3009, 3009–546, 3009–625, which preserved jurisdiction under 8 U.S.C. § 1105a(a) (repealed 1996), in cases such as this in which deportation proceedings were initiated prior to April 1, 1997, and in which the BIA issued its final order of deportation after October 30, 1996. *See Medina v. Gonzales*, 404 F.3d.628, 633 n. 3 (2d Cir.2005).

**3.** The IIRIRA replaced "deportation" with "removal" as the term of art to refer to the denial or revocation of admittance to this country. *See Edwards v. INS*, 393 F.3d 299, 302 n. 4 (2d Cir.2004) (discussing the change). Except when referring to specific statutory language, we will use the terms "deportation" and "removal" interchangeably in this opinion.

**4.** As recounted in the IJ's 2001 decision, there was some confusion concerning the IJ's initial understanding of the scope of Lin's motion to reopen. Yet Lin's motion expressly sought to reopen Lin's asylum and withholding of removal claims, as well as to introduce a new claim for CAT relief, and on that basis the IJ ultimately considered all three claims in the reopened proceedings. Respondent has

§ 208.16(c)(4) (implementing CAT); IIRI-RA § 601(a)(1), Pub.L. No. 104–208, div. C, 110 Stat. 3009, 3009–689 (amending the definition of persecution in 8 U.S.C. § 1101(a)(42)). In January 2001, the same IJ who had presided over Lin's 1994 hearing denied Lin's reopened application. The BIA summarily affirmed this new denial, and Lin now petitions for review of that final decision.

For the reasons that follow, we conclude that some of the IJ's 2001 findings were supported by substantial evidence, while others were marked by significant legal errors. Although several of those errors were not specifically raised in Lin's appeal to the BIA, Respondent's opposition to our review of Lin's petition did not assert Lin's failure to exhaust. Given Respondent's lack of objection, we hold that we may consider the merits of those arguments. Furthermore, because we cannot say with confidence that the IJ's errors did not affect his disposition of Lin's application, we grant Lin's petition for review, vacate the final order of removal, and remand Lin's application to the BIA.

## I. Background

Because the IJ's 2001 decision rests, in part, on the record from Lin's 1994 hearing, we begin our review of the relevant background with an account of Lin's entry into the United States and his initial removal proceedings.

### THE 1994 PROCEEDINGS

Lin entered the United States on or about April 17, 1993, through New Orleans, Louisiana.[5] He was deemed inadmissible and was taken into custody by the Immigration and Naturalization Service ("INS").[6] He remained in custody until June 4, 1993, when he was released on bond. On July 2, 1993, Lin, through counsel, successfully moved to transfer venue of his case to New York City, and on September 17, 1993, Lin applied for political asylum.

Lin's form I–589 Request for Asylum asserted that he had been persecuted by Chinese authorities because of his family's violation of China's one-child population control policy. The narrative portion of the form stated that Lin had two children, born in 1985 and 1986, and that the birth of his second child was unauthorized under Chinese family planning laws. As a result, the younger child could not be registered in the family's household registration book until Lin paid a fine of 6,000 yuan in 1990.

His application further attested that at the end of 1991, Lin's wife became pregnant for a third time, and that she was forced to undergo an abortion after family planning officials were informed of the

---

raised no objection to that approach. Therefore, we, like the IJ, will consider Lin's claims to asylum and withholding of removal, as well as CAT relief.

**5.** Although the IJ's January 31, 2001 decision states that Lin arrived in the United States at Miami, Florida, Lin's I–589 Request for Asylum, as well as his July 2, 1993 Motion for Change of Venue, indicate that Lin entered the United States through New Orleans. The parties do not mention this discrepancy, and we have been unable to glean an explanation for it from the record on appeal.

**6.** On March 1, 2003 the INS ceased to exist as an agency within the United States Department of Justice, and its responsibility for enforcement of United States immigration laws was transferred to the Department of Homeland Security Bureau of Immigration and Customs Enforcement. *See* 68 Fed.Reg. 10922, 10922; *Brown v. Ashcroft*, 360 F.3d 346, 348 n. 1 (2d Cir.2004). For ease of reference, and because all administrative proceedings in relation to Lin's application were completed prior to March 2003, this opinion will refer to the federal agency responsible for immigration enforcement as the "INS."

pregnancy. Following this abortion, Lin himself was ordered to undergo sterilization, and he fled to a friend's house. Family planning cadres sought Lin at his home, and, not finding him there, destroyed some of Lin's property as punishment. Lin's wife became pregnant for a fourth time at the end of 1992, and she was subjected to another forcible abortion. Once again family planning officials pursued and threatened to arrest Lin for sterilization. But Lin, following a friend's warning, had already left his home in January 1993, ultimately to come to the United States. Lin stated that, if returned to China, he would be subject to forcible sterilization and imprisonment because of his violation of China's family planning laws.

A hearing on Lin's application took place before an IJ on December 15, 1994. Lin, represented by counsel, testified on his own behalf and recounted many of the same facts that he had included in his written application.[7] In doing so, he added some further details. He described the fine of 6,000 yuan for the birth of his second son, as well as his wife's third pregnancy at the end of 1991 and the forcible abortion of this pregnancy. He dated this first abortion as occurring after the April 1992 discovery of his wife's pregnancy by the family planning cadres. At the time of this abortion, Lin received his first notification that he must submit to sterilization. In order to avoid the procedure, he went into hiding approximately

six kilometers from his home. He returned home after three months, upon payment, by his parents and his wife, of a fine of 3,000 yuan. In July 1992, around the time that Lin returned from hiding, his wife was implanted with an IUD. Approximately ten days later, Lin and his wife had the device removed by a private doctor, and soon thereafter, Lin's wife became pregnant for a fourth time. A government IUD check led to the discovery of that pregnancy, and Lin's wife was forced to undergo a second abortion in December 1992. Following this second abortion, family planning officials again sought Lin for sterilization, but based on a friend's warning, Lin had already fled. Shortly after, Lin left China for the United States.[8]

Lin's verbal account of the events surrounding his wife's December 1992 abortion also described an episode not mentioned in his I–589 form. Lin testified that family planning cadres took his wife to the hospital for the procedure. Lin went with them, and while waiting for his wife to emerge from the operating room, he became distraught at the situation. He began "verbally [to] abuse the [family planning] Cadres," calling them murderers and shouting slogans against family planning policy. Other individuals in the hospital waiting room were sympathetic and joined in. As a result of this impromptu protest, family planning officials attempted to ar-

---

**7.** We make reference to two portions of Lin's testimony—his description of the timeline of events from his wife's 1991 pregnancy to her second abortion, and his account of the events surrounding that second abortion—because of the IJ's reliance, in his 2001 decision, on these 1994 statements. We do not repeat those aspects of Lin's 1994 testimony that were not discussed in the IJ's 2001 decision. Cf. *Yu Sheng Zhang v. U.S. Dep't of Justice,* 362 F.3d 155, 159 (2d Cir.2004) ("Because we may not affirm the BIA on grounds that it

did not explicitly adopt, our review will necessarily be confined to the reasoning of the IJ." (internal quotation marks omitted)).

**8.** The IJ inquired of Lin why these details, in particular those pertaining to the IUD insertion and removal, had not been set forth in his I–589. Lin responded that he had not considered them to be important at the time that he prepared his application, because he had focused only on his own persecution.

rest Lin, but he managed to escape.[9]

The IJ denied Lin's application for asylum and withholding of removal in an oral decision of December 15, 1994. This decision was never appealed to the BIA.

### CHANGES IN LAW AND 2000– 2001 PROCEEDINGS

Subsequent to the IJ's 1994 decision, two changes in the law applicable to asylum and withholding of removal claims occurred. First, in 1996, Congress amended the INA to extend the definition of a political refugee, for purposes of asylum and withholding of removal claims, to individuals subjected to forced abortions or sterilizations, or who were otherwise persecuted for opposition to coercive population control programs. *See* IIRIRA § 601(a)(1), Pub.L. No. 104–208, div. C, tit. III, 110 Stat. 3009, 3009–699 (amending 8 U.S.C. § 1101(a)(42)).[10] The following year, the BIA interpreted the amended 8 U.S.C. § 1101(a)(42) as making the spouses of individuals who were forced to undergo sterilizations or abortions *per se* eligible for asylum. *See In re C–Y–Z*, 21 I. & N. Dec. 915, 918 (BIA 1997); *see also Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 187–88 (2d Cir.2005) (recounting the changing legislative and administrative positions regarding persecution through state-enforced family planning in U.S. immigration law).

Second, in 1998, Congress passed legislation to implement, in the immigration context, the Convention Against Torture. *See* Foreign Affairs Reform and Reconstruction Act of 1998, Pub.L. No. 105–277, div. C, 112 Stat. 2681, 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231). The following year, the Attorney General promulgated implementing regulations requiring that withholding of removal be granted to any alien who establishes that it is more likely than not that he or she would be subject to torture if returned to his or her country of removal. *See* 8 C.F.R. § 208.16(c)(4); *see also Mu–Xing Wang v. Ashcroft*, 320 F.3d 130, 133–34 (2d Cir. 2003) (recounting this legislative history).

On June 21, 1999, following these changes in the law, Lin, who had not yet been deported, moved to reopen his application for asylum and withholding of removal, seeking to be considered for relief under the IIRIRA family planning amendment and the new CAT regulations. Lin submitted a supplemental affidavit in support of his motion. That affidavit stated that if removed to China, Lin was likely to suffer torture based (1) on his past subversive activities, (2) on the Chinese government's demonstrated desire forcibly to sterilize him, and (3) on his violation of Chinese entry-exit laws. After Lin's motion to reopen was granted, Lin submitted additional documentary evidence in sup-

---

**9.** The government attorney asked Lin on cross-examination why he had not recounted the hospital protest in his I–589 form. Lin responded that he had stated in the form that he had accompanied his wife to the hospital, but that he had not included the other details because he had given only "a general account of what happened."

**10.** The amended statutory text provides, in relevant part:

For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involun-

tary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

11 U.S.C. § 1101(a)(42).

port of his asylum and withholding claims, including Chinese household registration documents and an affidavit from his wife.

A hearing on Lin's reopened application was conducted on November 27, 2000, before the same IJ who had presided over Lin's 1994 hearing. At this second hearing, Lin testified to the following facts— some of which were either not discussed in or contradictions of Lin's 1994 testimony.

Lin stated that he was married with two sons, one born April 24, 1985 and the second born November 5, 1986. During Lin's wife's second pregnancy, she went into hiding at "[a] friend's and relative's," and also at her mother's home, six kilometers away. Lin added that he was fined 6,000 yuan for the birth of this second son, and that the fine was paid in December 1990, thereby allowing Lin to register the child with the government.

According to his 2000 version of events, Lin's wife was implanted with IUDs on three separate occasions. The first was after the 1985 birth of Lin's first son. Lin and his wife had that IUD removed two months later, and the second son was subsequently conceived. Another IUD was implanted after the second birth, and this device remained in place until 1991. Nevertheless, Lin's wife became pregnant for a third time in 1991. Because the IUD had failed, Lin sought permission for the pregnancy from the Chinese government. This request was denied, and Lin's wife was forced to undergo her first abortion in October 1991 (rather than, as he testified in 1994, in April 1992). Following this abortion, a third IUD was implanted. This, too, was removed by a private doctor, and Lin's wife became pregnant for a fourth time in October 1992. Lin testified, as he had in 1994, that this pregnancy was discovered during a routine IUD check in

November 1992, and that Lin's wife was subsequently ordered to undergo a second abortion.[11]

As in 1994, Lin testified in 2000 to having been twice threatened with forcible sterilization by the family planning authorities. The first time, he stated, was after his wife's first abortion in October 1991. Lin again recounted that he went into hiding to avoid the procedure, and that while he was away, government authorities looking for him searched his home and destroyed some of his property. Consistent with his prior descriptions, Lin testified that he returned home following his family's payment of a fine of 3,000 yuan. But in contrast to his 1994 testimony that he was away for three months, this time Lin stated that he fled for approximately ten days. As in 1994, Lin testified to a second sterilization threat that occurred following his wife's second abortion in late 1992. Lin again described that he had learned from a friend that family planning Cadres intended to come to his home to take him for sterilization. This prompted Lin to flee his home and to leave China for the United States.

As in his first hearing, Lin testified that during his wife's second abortion, he engaged in anti-government conduct at the hospital. His testimony in 2000, however, outlined a less dramatic set of events than those he had described in 1994. Lin stated that while he was in the hospital waiting room he was "very emotional" and "resented the birth control policy" and said that the policy "was not good" and that the "birth control cadres were inhumane." In response, he was pushed into the "security section" of the hospital. When his wife emerged from the surgery she was very

---

**11.** Lin said that he received a government certificate for this abortion, as well as a certificate for the 1991 abortion, but that both documents had been lost.

weak, and Lin left the hospital to assist her back home.

When the IJ asked Lin to account for the discrepancy between his two accounts of the events at the hospital surrounding his wife's second abortion, and in particular, the circumstances of his departure, Lin floundered, saying that he had been "nervous" in 1994, and the account given that day "was wrong." The IJ also questioned Lin concerning the differences between his 1994 and 2000 accounts of the sequence of his wife's IUD insertions and abortions, and the time during which he was in hiding after the first threatened sterilization. Lin stated that he had been mistaken in his 1994 testimony, and that during the intervening time, he had spoken with his wife who had corrected him concerning the dates of her medical procedures. He also said, with respect to the period he spent in hiding, that he had made mistakes in 1994 because he was nervous and because the law firm representing him had prepared him in a way that he did not understand.

Finally, Lin testified at the 2000 hearing that he feared that if he returned to China he would be persecuted for having been smuggled out. He added that the Chinese government was cracking down on smuggling in his home province, and that his wife recently had told him, over the telephone, that a neighbor who was unsuccessful in being smuggled out of China had been arrested and beaten by Government authorities, and fined 10,000 yuan. With respect to his own story, Lin testified that his friends and family made arrangements for him to leave the country. A snakehead gave Lin papers and a valid passport, which he showed to officials at the time of his departure.

During the 2000 hearing, the IJ also discussed certain facts contained in Lin's wife's affidavit. The affidavit gave an es-

sentially identical account of the events testified to by Lin in 2000, but with respect to her own period of hiding, Lin's wife stated that she had hidden "far away" at a "friend's place." The IJ asked why Lin's wife's affidavit asserted that she stayed "far away" if, as Lin had testified, her mother's home was only six kilometers away. Lin responded that his "mother-in-law's home was not the only place she went, she went to different places."

At a proceeding on January 31, 2001, the IJ delivered his oral decision denying Lin's application. At the start of this hearing Lin's counsel informed the IJ, for the first time, that Lin's wife had undertaken divorce proceedings. The IJ stated that this development "has no bearing on this application" and made no further inquiry into this subject, and neither Lin nor his counsel offered any further details.

The IJ's decision on January 31, 2001 found that Lin's testimony was not credible, and on that basis concluded that Lin had failed to meet his burden of proof with respect to any of his claims for relief. The IJ stated that "significant discrepancies between [Lin's] testimony at the hearing of November 27, 2000, and at the prior hearing before this very Court on December 15, 1994 .... suggest strongly that [Lin was] not testifying from actual experience, but that he [was] actually fabricating testimony." The IJ pointed to two categories of discrepancies in support of his conclusion: (a) Lin's changed testimony concerning the dates of his wife's medical procedures and his period in hiding following his wife's first abortion, and (b) Lin's differing accounts of his alleged hospital protest during his wife's second abortion. With respect to these inconsistencies, as well as Lin's explanations for them, the IJ stated:

> While the Court can understand that the applicant's wife would be able to more

accurately recall the dates when the IUDs were inserted and/or removed and when the abortions took place. [sic] Even if the Court were to overlook these discrepancies in the applicant's testimony, he has not been able to explain why he fabricated the story about leading others in slogans at the hospital and then escaping from the hospital, and that the cadres were chasing him.

Now clearly, this is the type of discrepancy that strongly suggests, well doesn't just suggest, it is direct evidence that the applicant has fabricated his story because there is absolutely no way that someone, because that person is nervous or simply makes a mistake, will casually say under oath that they were shouting slogans and the cadres were chasing him, when in fact this never happened.

The IJ also discussed, with respect to Lin's claim of his wife's forced abortions, three non-corroborative aspects of Lin' documentary evidence: (1) an inconsistency between Lin's testimony that his wife had, during her second pregnancy, gone into hiding at her mother's house six kilometers away, and his wife's statement in her affidavit that she had hidden "far away"; (2) an apparent discrepancy between Lin's testimony that his second son was not registered until a fine was paid in December 1990, and the household registry submitted by Lin that appeared to indicate that both sons were registered in February 1990; and (3) purported variations in dates of registration between a translated household registry and an untranslated registry submitted by Lin. The IJ also observed that, in light of a State Department country report indicating that certificates were issued only for voluntary abortions, Lin's testimony that he had re-

ceived such certificates in 1991 and 1992 belied his claim that the procedures were coerced.[12]

Concerning Lin's future persecution and torture claims, the IJ found (a) that any threat of sterilization faced by Lin had been removed by the pendency of his divorce proceedings, (b) that Lin's account of having been smuggled from China was burdened by inconsistencies relating to the circumstances of his departure, and (c) that Lin's description of his neighbor's persecution for smuggling was never mentioned in Lin's written statement supporting his CAT claim. Finally, the IJ stated with respect to Lin's CAT claim that, even assuming that a threat of sterilization remained for Lin, the IJ could not "find that as a matter of law, sterilization is tantamount to an act of torture."

## THE BIA APPEAL

Lin timely appealed the IJ's decision to the BIA. His Notice of Appeal asserted that the IJ erred in determining that Lin's 2000 hearing testimony was inconsistent with that presented in 1994. Lin elaborated that the IJ erred: (1) by rejecting Lin's explanation for his new testimony about the dates of his wife's IUD insertions and abortions—namely, that he had discussed the issue with his wife in the intervening years, (2) by failing to appreciate that Lin's 1994 testimony regarding his wife's experiences was given in the context of pre-IIRIRA asylum law, and (3) by concluding that Lin's story concerning his sloganeering and detention at the time of his wife's second abortion was fabricated, and that this fabrication called into question Lin's claim that his wife had undergone forcible abortions. Additionally, Lin con-

12. The IJ's decision does not indicate the year of the country report on which he relied for his information. The only such report that appears to have been in the record of the 2000 hearing is dated April 1999.

tended that his asylum claim had been corroborated, *inter alia,* by his wife's affidavit and by household registration documents. Finally, the brief asserted that Lin had established that his fears of coercive sterilization and punishment for violation of China's exit laws were reasonable and credible.

On November 8, 2002 the BIA summarily affirmed the decision of the IJ.

### ARGUMENTS RAISED BY LIN'S PETITION FOR REVIEW

Lin's petition for review by us is an extensive list of challenges to the IJ's decision. Several of Lin's arguments restate or closely track the above-described points made in his appeal to the BIA. Several other IJ errors asserted in Lin's current petition for review, however, were not argued in Lin's appeal to the BIA. These include: (1) that the IJ incorrectly found Lin's account of his wife's period in hiding to be not credible; (2) that the IJ erred in relying on a household registration booklet not placed into evidence; (3) that the IJ wrongly premised a finding that Lin's wife's abortions must have been voluntary on information contained in a State Department country report; (4) that the IJ had no basis in the record for his finding that Lin's pending divorce removed any future threat of sterilization in China; and (5) that the IJ's conclusion that forcible sterilization did not amount to torture was legal error.[13]

Lin's petition also preemptively argued the jurisdiction of this court to hear issues not argued to the BIA. Had we been urged by the Respondent not to review the arguments that Lin failed to raise before the BIA, we would not consider their merits. *See* 8 U.S.C. § 1252(d); *Foster v. INS,* 376 F.3d 75, 78 (2d Cir.2004) (per curiam); *Theodoropoulos v. INS,* 358 F.3d 162, 173–74 (2d Cir.2004). But for reasons discussed below, in light of the Respondent's failure to challenge Lin's petition for review on exhaustion grounds, we will review all of the issues raised in the petition.[14]

## II. Discussion

### A. Eligibility for Asylum, Withholding of Removal, and CAT Relief

Asylum under the INA, withholding of removal under the INA, and withholding of removal under the CAT require applicants to satisfy distinct burdens of proof. A petitioner's burden to establish eligibility is lighter in the context of an asylum claim, but the power to grant such relief lies in the discretion of the Attorney General. *See Jin Shui Qiu v. Ashcroft,* 329 F.3d 140, 148 (2d Cir.2003). Withholding of removal, under either the INA or the CAT, requires a greater quantum of proof, though relief is mandatory once an applicant establishes eligibility. *Id.*

To establish eligibility for asylum, an applicant must demonstrate that he is a "refugee" within the meaning of the

---

**13.** The last of these alleged errors is relevant only to Lin's CAT claim.

**14.** Because we conclude that, in the absence of a challenge by Respondent on exhaustion grounds, we have jurisdiction to review the whole of Lin's petition, *see infra,* we need not, and hence do not, consider which, if any, parts of Lin's petition involve subsidiary arguments that are, in any event, reviewable by us, and which, instead, constitute new issues that, absent Respondent's waiver, needed to

be raised below. *See Gill v. INS,* 420 F.3d 82, 86 (2d Cir.2005) (finding that § 1252(d)(1) "bars the consideration of bases for relief that were not raised below, and of general issues that were not raised below, but not of specific, subsidiary legal arguments, or arguments by extension, that were not made below"). We leave any resolution of *what constitute* subsidiary arguments and what are new issues to another day.

INA—*i.e.*, that he has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or that he has a well-founded fear of future persecution. *See* 8 U.S.C. § 1158(b)(1); 8 U.S.C. § 1101(a)(42); *Islami v. Gonzales*, 412 F.3d 391, 394 (2d Cir.2005). If a petitioner seeks asylum based on a showing of past persecution, that is only "the first of two hurdles that an alien must meet in order to merit a favorable exercise of discretion." *Islami*, 412 F.3d at 396 n. 3 (internal quotation marks omitted). A showing of past persecution triggers a rebuttable presumption of future persecution, which the government can defeat, *inter alia*, by demonstrating a change in conditions in the country of origin that eliminates the danger. *Id.* On the other hand, where a well-founded fear of future persecution is demonstrated, an applicant for asylum need not additionally establish the existence of past persecution in order to be eligible for relief. *Id.*

Withholding of removal also requires an applicant to show that he or she falls within one of the categories designated for "refugee" status by the INA. But to obtain this non-discretionary form of relief, an applicant must clear the higher hurdle of showing that it is more likely than not that, were he or she to be deported, his life or freedom would be threatened on account of the characteristic rendering him or her a refugee. *See* 8 U.S.C. § 1231(b)(3)(A); *Islami*, 412 F.3d at 395; *Zhou Yun Zhang v. INS*, 386 F.3d 66, 71 (2d Cir.2004).

Similarly, an individual seeking withholding of removal on the basis of a claim under the CAT must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 184 (2d Cir.2004)

(quoting 8 C.F.R. § 208.16(c)(2)). "Torture" is defined, for purposes of a CAT withholding claim, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" by persons acting in an official capacity. 8 C.F.R. § 208.18(a)(1); *see also Ramsameachire*, 357 F.3d at 184 (discussing same).

## B. Judicial Review of Final Agency Determinations

 Factual findings by the BIA are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Our court interprets this statutory language as a statement of the substantial evidence standard, which requires that an IJ's findings be supported by "reasonable, substantial and probative evidence in the record." *Islami*, 412 F.3d at 396; *Jin Shui Qiu*, 329 F.3d at 149 ("Substantial evidence review in the immigration context is 'slightly stricter' than the clear-error standard that the circuit courts typically apply in reviewing a district court's factual findings, yet we will 'not reverse the [IJ] simply because we disagree with [his] evaluation of the facts.'" (quoting *Aruta v. INS*, 80 F.3d 1389, 1393 (9th Cir.1996))). Where, as here, the BIA summarily affirms an IJ's decision pursuant to its streamlining regulations, 8 C.F.R. § 1003. 1(e)(4)(I), we directly review the factual and legal findings contained in the opinion of the IJ. *See Dhoumo v. BIA*, 416 F.3d 172, 174 (2d Cir.2005) (per curiam).

 When reviewing an IJ's credibility findings, we "afford particular deference in applying the substantial evidence standard." *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir.2004) (internal quotation marks omitted). This deference is at its highest point where an IJ's credibility determinations are based on observation of

the applicant's demeanor; but it ebbs where credibility determinations are based on analysis of testimony. *See Jin Chen v. U.S. Dep't of Justice*, 426 F.3d 104, 113 (2d Cir.2005). In reviewing an IJ's conclusions regarding credibility, we examine whether the IJ "has provided 'specific, cogent' reasons for the adverse credibility finding and whether those reasons bear a 'legitimate nexus' to the finding." *Zhou Yun Zhang*, 386 F.3d at 74 (quoting *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003)).

▮▮ Questions of law, including what quantum of evidence will suffice to discharge an applicant's burden of proof, are reviewed *de novo*. *Islami*, 412 F.3d at 396. And, an IJ's use of an "inappropriately stringent standard" in assessing an applicant's testimony is a legal, rather than a factual, error. *Id.* (internal quotation marks omitted).

▮ Our review of decisions by the BIA is governed by the recognition that "a judicial judgment cannot be made to do service for an administrative judgment." *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 2006 WL 1755289, at *5 (2d Cir. June 28, 2006) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). Stemming from this foundational principle, "a denial of immigration relief stands or falls on the reasons given by the [IJ or BIA]," *Li Zu Guan v. INS*, 453 F.3d 129, 2006 WL 1776717 at *5 (2d Cir. June 29, 2006), because it would usurp the role of the agency for a reviewing court "[t]o assume a hypothetical basis for the IJ's determination, even one based in the record," *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir.2005). Except in "rare circumstances," then, "the proper course ... is to remand to the agency for additional explanation or investigation." *Twum v. INS*, 411 F.3d 54, 61 (2d Cir.2005) (quoting *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam)).

▮ Yet agency errors do not always warrant remand, and our circuit has recently developed standards for determining whether remand of asylum or withholding claims would amount to an empty and unnecessary formality. *See Li Zu Guan*, 453 F.3d 129, 2006 WL 1776717 at *5–*6. We have determined that "remand to the BIA is futile a) when the IJ articulates an alternative and sufficient basis for her determination; b) when her reliance on the erroneous aspect of her reasoning is substantially tangential to her non-erroneous findings; or c) when overwhelming evidence in the record makes it clear that the same decision is inevitable on remand, or, in short, whenever the reviewing panel is confident that the agency would reach the same result upon a reconsideration cleansed of errors." *Li Hua Lin*, 453 F.3d 99, 2006 WL 1755289 at *6 (relying on *Cao He Lin*, 428 F.3d at 395–401 and *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 161–62 (2d Cir.2006)). Implementing this test within the confines of *Chenery* requires a careful balancing, which different panels dealing with diverse fact patterns may well strike differently. *See Ming Xia Chen v. BIA*, 435 F.3d 141, 145 (2d Cir. 2006) (stating, in the context of panels' differing assessments of adverse credibility findings, that "[p]anels will have to do what judges always do in similar circumstances: apply their best judgment, guided by the statutory standard governing review and the holdings of our precedents, to the administrative decision and the record assembled to support it").

With these delicate standards in mind, we turn to the specific issues raised by Lin's petition for review.

## C. Our "Jurisdiction" to Consider Issues Not Raised Below

Our jurisdiction to hear the full scope of arguments presented in Lin's petition for

review has not been contested. Several issues raised in that petition, however, were not included in Lin's brief on appeal to the BIA, and as discussed·below, they alter the proper disposition of Lin's petition for review.[15] In light of our court's doctrine of issue exhaustion and the government's failure to invoke this doctrine, we must consider the nature of issue exhaustion under the INA and its potential for waiver by a party. .

The judicial review provision of the INA states that we may review a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). Thus, in the context of Lin's asylum and withholding of removal claims, we have jurisdiction to review the "final order of removal" entered against Lin, so long as a decision has been rendered on his application by an IJ and appealed to the BIA—the two administrative remedies available

to him as of right.[16] *See* 8 C.F.R. §§ 208.4(b)(3), 1003.1(b)(3); *see also Theodoropoulos v. INS*, 358 F.3d 162, 168–69, 172–74 (2d Cir.2004) (holding that a petitioner's express waiver of his right to appeal to the BIA deprived the court of subject matter jurisdiction to hear his subsequent petition for review). We have repeatedly characterized this exhaustion of administrative remedies as "mandatory." [17] *See Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 343 (2d Cir.2006); *Gill v. INS*, 420 F.3d 82, 85 (2d Cir.2005); *Foster*, 376 F.3d at 77. In the present case, Lin pursued and completed both tiers of administrative review.

The question we face in the instant case is whether the exhaustion of "administrative remedies available to the alien as of right" further requires, as a matter of *statutory jurisdiction*, that an immigration petitioner raise before the

15. As noted above, some of the points raised by Lin to us, and not to the BIA, might be described as subsidiary arguments rather than new issues. In view of Respondent's failure to object to our consideration of any of Lin's arguments and our conclusion that Respondent's waiver is effective, we need not address the broader, and difficult question of what are new "issues" as against new subsidiary arguments. *See supra* note 13. And we accordingly assume, for purposes of this opinion, that all of Lin's new arguments constitute new issues.

16. Our court has rejected the position that the filing of a motion to reopen proceedings, following the denial of a petitioner's administrative appeal to the BIA, is required in order for the petitioner to have exhausted administrative remedies available to him or her "as of right." *See Arango–Aradondo v. INS*, 13 F.3d 610, 614 (2d Cir.1994) (adopting the reasoning of the Seventh Circuit's decision in *Rhoa–Zamora v. INS*, 971 F.2d 26, 31 (7th Cir. 1992)).

17. Statutory administrative exhaustion schemes such as the one prescribed by

§ 1252(d)(1), in contrast to judicially-imposed exhaustion requirements, generally admit of no exceptions. *See Booth v. Churner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (stating, in the context of a failure to utilize all stages of a prison grievance system, which was subject to the exhaustion requirements of the Prison Litigation Reform Act of 1995, that the Court would "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *Ivanishvili*, 433 F.3d at 343 (statutory exhaustion requirements do not yield to common law exceptions to rules of exhaustion); *Theodoropoulos*, 358 F.3d at 172 (as a general matter, 8 U.S.C. § 1252(d) admits of no common law exceptions, in contrast to judicially-imposed exhaustion requirements). *But see Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 54 (2d Cir.2004) (excusing a habeas petitioner's failure to appeal his initial deportation order to the BIA on the ground that doing so was required to prevent manifest injustice); *Theodoropoulos*, 358 F.3d at 173 (suggesting that in "some limited circumstances," such as proof of futility, exceptions may be made even to statutory exhaustion requirements).

BIA all *issues*[18] contained within his or her petition for review to this court, or whether, instead, the requirement of issue exhaustion is a court-imposed one that is subject to waiver. *Cf. Sims v. Apfel*, 530 U.S. 103, 106–07, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (contrasting, in the Social Security context, exhaustion of administrative remedies with issue exhaustion). While our court has consistently applied an issue exhaustion requirement to petitions for review from the BIA, we have not evaluated the origin of this requirement, and thus its susceptibility to waiver by the government.

In some recent cases, our court has spoken in a manner that seemed to conflate § 1252(d)(1)'s statutory jurisdictional requirement of exhaustion of remedies with the separate requirement of exhaustion of issues. But we did so without exploring the distinction. *Compare, e.g., Theodoropoulos*, 358 F.3d at 168 (stating, in the context of a habeas petitioner's *failure to appeal* an IJ's decision to the BIA, that this "failure to exhaust ... administrative remedies deprived the district court of subject matter jurisdiction to entertain his habeas petition") *and Mejia–Ruiz v. INS*, 51 F.3d 358, 362 (2d Cir.1995) (finding that a petitioner triggered "a clear jurisdiction-al bar" based on failure to exhaust administrative remedies when he had voluntarily departed during pendency of his BIA appeal, which constituted a *withdrawal of his appeal* to the agency), *with Foster*, 376 F.3d at 77 (citing *Theodoropoulos* and *Mejia–Ruiz* for the proposition that, where the INS challenged the petitioner's failure to raise before the BIA all *issues* contained in the petition for review, a "failure to exhaust [statutory exhaustion requirements such as § 1252(d)(1) ] constitutes a clear jurisdictional bar" (internal quotations omitted)).[19]

We now find ourselves obliged to face squarely the nature of our issue exhaustion requirement. In undertaking this inquiry, we are mindful of the Supreme Court's recent admonition that inferior courts must use great caution in distinguishing mandatory from jurisdictional rules. *See Eberhart v. United States*, 546 U.S. 12, 126 S.Ct. 403, 405, 163 L.Ed.2d 14 (2005) (per curiam) ("Clarity would be facilitated ... 'if courts and litigants used the label "jurisdictional" not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory

**18.** Our precedents distinguish *issues* from *categories of relief* in exhaustion doctrine, and we preserve that distinction here, confining our holding to arguments and issues. *Cf supra* note 13; *see Gill*, 420 F.3d at 85–86 (distinguishing our precedents along these lines); *see also Beharry v. Ashcroft*, 329 F.3d 51, 56–59 (2d Cir.2003) (discussing the statutory bases and parameters of our exhaustion rule that petitioners must raise to the BIA each type of relief sought on appeal).

**19.** Adding further ambiguity to the origins of our issue exhaustion rule and its susceptibility to waiver, in *Abimbola v. Ashcroft*, 378 F.3d 173, 180 (2d Cir.2004), decided shortly after *Foster* and by the same panel, we expressly treated as an open question the jurisdictional effect of a lack of issue exhaustion in a situa-tion in which the government had seemingly waived objection. As in *Foster*, the petitioner in *Abimbola* had failed to argue the contested issue before an IJ, though, unlike the *Foster* petitioner, he had made the point before the BIA. *Compare Abimbola*, 378 F.3d at 180, *with Foster*, 376 F.3d at 78. In *Abimbola*, we noted that the petitioner might not have exhausted all issues raised by his petition, but we observed that the Attorney General had not raised any question as to our jurisdiction over the merits of that potentially unexhausted claim. Concluding that the new argument was, in any case, meritless, we expressly declined to reach the problem of the "jurisdictional issue" in the case. *Abimbola*, 378 F.3d at 180.

authority.' ") (quoting *Kontrick v. Ryan,* 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004)). Our court recently performed this task of clarification in the context of exhaustion requirements for the Employee Retirement Income Security Act ("ERISA") § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), finding that such requirements were a non-jurisdictional affirmative defense. *See Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 443–46 (2d Cir.2006) (describing the court's task as to determine "whether the administrative exhaustion requirement under ERISA § 502(a)(1)(B) is truly 'jurisdictional' in the Article III sense, or is more akin to a 'claim-processing rule,' which would be an affirmative defense subject to equitable considerations such as waiver, estoppel or futility").

The use of "jurisdictional" language in cases like *Foster,* none of which expressly considered the question of whether the Attorney General might *waive* an argument as to issue exhaustion, cannot, without more, be held to govern cases in which the government has failed to raise an exhaustion argument. Today we hold (a) that 8 U.S.C. § 1252(d)(1) does not make issue exhaustion a statutory jurisdictional requirement, (b) that as a result, a failure to exhaust specific issues may be waived by the Attorney General, (c) that in the case before us such a waiver occurred, and (d) that, therefore, in our discretion we may choose to review Lin's arguments not previously made to the BIA.

Our conclusion in this regard rests primarily on the language of § 1252(d)(1), which, as the Eighth Circuit has noted, does not expressly proscribe judicial review of issues not raised in the course of exhausting all administrative remedies.[20] *See Etchu–Njang v. Gonzales,* 403 F.3d 577, 581–82 (8th Cir.2005) ("While some statutes governing judicial review of administrative agency decisions explicitly require exhaustion of issues ... the exhaustion requirement of § 1252(d)(1) does not

---

**20.** The Eighth Circuit ultimately found, based on the government's objection to the court's jurisdiction, that § 1252(d)(1) did require exhaustion of issues before the BIA, though the court "[a]ssum[ed] for the sake of argument that there may be exceptions to the issue exhaustion requirement." *Etchu–Njang,* 403 F.3d at 581–85. The court noted that "[b]y analogy to § 2254(b) and consistent with the distinction between exhaustion of remedies and issues discussed in [*Sims v. Apfel,* 530 U.S. 103, 106, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000)], the plain language of § 1252(d)(1) could be read to require only exhaustion of remedies available as of right," but it found itself bound by prior Eighth Circuit precedent interpreting 8 U.S.C. § 1105a(c) (1994), the INA's exhaustion requirement prior to the enactment of 8 U.S.C. § 1252(d)(1) as part of IIRIRA. *Etchu–Njang,* 403 F.3d at 582. Also faced with a jurisdictional objection by the government, the First Circuit reached a conclusion similar to that of the Eighth Circuit, stating that "[w]hatever our own views, we are bound by precedent to apply the INA exhaustion requirement in a more draconian fashion" based on its prior interpretation of 8 U.S.C. § 1105a(c) (1994). *Sousa v. INS,* 226 F.3d 28, 31 (1st Cir.2000). But the circuit noted that "[e]ven where statutes impose an exhaustion requirement the Supreme Court has, despite the rhetoric of jurisdiction, carved out exceptions." *Id.* at 32.

To the extent that the dissent relies on these cases, we note that we have never undertaken a similarly detailed analysis of 8 U.S.C. § 1105a(c) (1994). In *Der–Rong Chour v. INS,* cited by the dissent, we simply stated that issue exhaustion was mandatory, without finding that such exhaustion was a feature of our subject matter jurisdiction or providing analysis on the issue. *See Der–Rong Chour v. INS,* 578 F.2d 464, 468 (2d Cir.1978) ("[Petitioner] has never previously presented his ... theory to the Board, which precludes review of that claim here"); *see also Arango–Aradondo v. INS,* 13 F.3d 610, 614 (2d Cir.1994) (stating, without further discussion, that 8 U.S.C. § 1105a(c) required the petitioner to raise his ineffective assistance of counsel claim in the first instance with the BIA).

do so by its terms."). In contrast, as the Supreme Court observed in *Sims*, Congress has, in other contexts, expressly written issue exhaustion requirements into statutes. *See Sims,* 530 U.S. at 107–08, 120 S.Ct. 2080 (noting that the Court's prior cases addressing issue exhaustion reflect the fact "that requirements of administrative issue exhaustion are largely creatures of statute"); *see also, e.g.,* 29 U.S.C. § 160(e) (National Labor Relations Act provision proscribing judicial review of any "objection that has not been urged before the Board, its member, agent, or agency"); 15 U.S.C. § 77i(a) (Securities and Exchange Act of 1933 provision providing that judicial review of an order of the Securities and Exchange Commission is limited to "objection[s] ... urged before the Commission").

In the absence of an express statutory issue-exhaustion requirement, the Supreme Court, interpreting the Social Security Act, has said that it is "not necessarily" the case that "an issue-exhaustion requirement is 'an important corollary' of any requirement of exhaustion of remedies." *Sims,* 530 U.S. at 107, 120 S.Ct. 2080; *see also id.* at 112, 120 S.Ct. 2080 (holding that "a judicially created issue-exhaustion requirement is inappropriate" in the context of Social Security proceedings). Moreover, the High Court has also suggested that the same distinction applied to exhaustion requirements for federal habeas review. The Court stated that "[a] habeas petitioner who has de-

faulted his federal *claims* in state court meets the technical requirements for exhaustion; there are no state *remedies* any longer 'available' to him." *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis added). Significantly, the exhaustion requirement in the current version of 28 U.S.C. § 2254(b)(1), as well as in the version at issue in *Coleman,* closely tracks the language of 8 U.S.C. § 1252(d)(1).[21] *See Theodoropoulos,* 358 F.3d at 169 ("[T]he exhaustion requirement set forth in [8 U.S.C. § 1252(d)(1) ] echoes that in 28 U.S.C. § 2254...."). *Compare* 28 U.S.C. § 2254(b)(1). ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State ...."), *with* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if ... the alien has exhausted all administrative remedies available to the alien as of right....").

We are persuaded, both on the language of § 1252(d)(1) and on these authorities, that the exhaustion of "all administrative remedies available to [an] alien as of right" under 8 U.S.C. § 1252(d)(1) does not require—as a *statutory* matter—that a petitioner for relief from removal raise to the BIA each issue presented in his or her petition for judicial review. Therefore, in the context of 8 U.S.C. § 1252(d)(1), the

**21.** *Coleman* analyzed the language of 28 U.S.C. § 2254(b) that existed prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996, which amended § 2254 to permit the denial of a petition for habeas corpus on its merits, notwithstanding the failure of the petitioner to exhaust administrative remedies, and to authorize states, through counsel, to "expressly waive[ ]" the exhaustion requirement. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–

132, § 104(2)(3), 110 Stat. 1214 (amending 28 U.S.C. § 2254(b)). These changes, however, made no substantial alterations to the language analyzed by the *Coleman* court. *See* 28 U.S.C. § 2254(b) (1990) ("An application for a writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State.").

failure to exhaust individual issues before the BIA does not deprive this court of *subject matter jurisdiction* to consider those issues.

That conclusion does not mean, however, that petitioners seeking review of their removal orders are ordinarily excused from issue exhaustion. Quite the contrary. Usually, the requirement of § 1252(d)(1) that federal courts review only "final orders of removal" has the effect of imposing a bar to the review of issues not raised to the BIA. That requirement has been read by us, by the Supreme Court, and by other circuits to mean that when the BIA issues an opinion in a petitioner's administrative appeal, and that opinion constitutes the final agency determination, we may consider only those issues that formed the basis for that decision. *See, e.g., Jin Shui Qiu,* 329 F.3d at 149 (stating that we may affirm a decision of the BIA only upon the basis of such reasoning as was applied by the Board); *see also SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); *Yatskin v. INS,* 255 F.3d 5, 9 (1st Cir.2001) ("[A] reviewing court should judge the action of an administrative agency based only on reasoning provided by the agency. . . .").

It follows that, when an applicant for asylum or withholding of removal has failed to exhaust an issue before the BIA, and that issue is, therefore, not addressed in a reasoned BIA decision, we are, by virtue of the "final order" requirement of § 1252(d)(1), usually unable to review the argument. *Cf. Gill,* 420 F.3d at 86 (holding, in a case involving a reasoned opinion by the BIA, that we may consider "specific, subsidiary legal arguments, or arguments by extension, that were not made below" where the petitioner did raise all bases for relief and general issues to the BIA.).

But such is not the case when, as here, the BIA order is not the agency determination we review. When the BIA invokes its summary affirmance authority pursuant to its streamlining regulations, the decision of the IJ constitutes the "final agency determination," *see* 8 C.F.R. § 1003.1(e)(4), and the entirety of that decision—containing both issues that were and issues that were not raised to the BIA—is before us on review. *See Yu Sheng Zhang v. U.S. Dep't of Justice,* 362 F.3d 155, 159 (2d Cir.2004) (per curiam) (stating, in upholding the BIA's streamlining regulations, that "[b]ecause we may not affirm the BIA on grounds that it did not explicitly adopt, our review will necessarily be confined to the reasoning of the IJ" (internal quotation marks omitted)); *see also Albathani v. INS,* 318 F.3d 365, 377–78 (1st Cir.2003) ("Because the summary affirmance is only of the 'result' and not the reasoning, this means that courts of appeals are forced to review a decision which may or may not contain the reasoning of the BIA. The court thus reviews the BIA decision without knowing its basis. . . . The courts will continue to have the IJ's decision and the record upon which it is based available for review.").

For this reason, the First Circuit recently opted to exercise review—*over the Attorney General's objection*—of issues that an asylum petitioner had not fully developed before the BIA. *See Singh v. Gonzales,* 413 F.3d 156, 160 n. 3 (1st Cir.2005) (rejecting the Attorney General's claim that an alien's objections to an IJ's rejection of his withholding of removal and CAT claims were unexhausted where the claims had been only "perfunctor[ily]" raised in a BIA appellate brief, and reasoning that

because the BIA invoked its summary affirmance procedure, it had affirmed the entire opinion of the IJ).

That said, the fact that courts of appeals are not statutorily-precluded from reviewing issues not raised to the BIA does not mean that they must or, usually, will consider such arguments. Judicially-imposed doctrines of issue exhaustion, which courts invoke even in the absence of statutory exhaustion requirements as "an analogy to the rule that appellate courts will not consider arguments not raised before trial courts," *Sims*, 530 U.S. at 108–09, 120 S.Ct. 2080, will usually mean that issues not raised to the BIA will not be examined by the reviewing court. Consistent with the strong prudential rationale for requiring all issues raised on appeal to have been presented below, our circuit applies an issue exhaustion doctrine to petitions for review from the BIA. *See, e.g., Foster*, 376 F.3d at 78 ("To preserve a claim, we require [p]etitioner to raise issues to the BIA in order to preserve them for judicial review." (internal quotation marks and emphasis omitted)); *Gill*, 420 F.3d at 86 (reading our past precedents as barring "the consideration of bases for relief that were not raised below, and of general issues that were not raised below" although "we have never held that a petitioner is limited to the exact contours of his argument below").

In contrast to statutory exhaustion, however, judicial exhaustion permits courts, "in their discretion," to "waive administrative exhaustion under certain circumstances." *Bastek v. Fed. Crop Ins. Co.*, 145 F.3d 90, 94 (2d Cir.1998); *see also id.* at 94 n. 4 (setting forth criteria used by courts in deciding whether to waive the judicial administrative exhaustion requirement); *see also Beharry v. Ashcroft*, 329 F.3d 51, 56–58 (2d Cir.2003) (discussing the distinction between statutory and judicially-imposed exhaustion requirements).

 In the present action, we deem the Attorney General's silence on the petitioner's issue exhaustion problem to constitute a waiver.[22] And waiver by a party is, of course, among the reasons courts may excuse non-jurisdictional exhaustion requirements.[23] *See Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir.2004) (holding—in the context of a mandatory, but non-jurisdictional exhaustion rule—that the failure to exhaust available administrative remedies is an affirmative defense that is waiveable); *see also Granberry v. Greer*, 481 U.S. 129, 132–33, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (holding that a state may, even inadvertently, waive the pre-AEDPA federal habeas exhaustion requirement), *cited in Day v. McDonough*, 547 U.S. 198, 126 S.Ct. 1675, 1682, 164 L.Ed.2d 376 (2006); *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("[T]he Secretary [of Health, Education, and Welfare] may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief

---

**22.** Notably, Lin's opening brief expressly put the agency on notice of the new arguments raised in his petition for review, because he argued jurisdictional grounds for this court to consider issues not first raised before the BIA. *See* Petitioner's Opening Br. at 22–23.

**23.** In the context of a distinct type of non-jurisdictional affirmative defense, the statute of limitations defense, the Supreme Court re-

cently stressed that "[courts] surely have no obligation to assist attorneys representing the State." *Day v. McDonough*, 547 U.S. 198, 126 S.Ct. 1675, 1684, 164 L.Ed.2d 376 (2006) (holding that courts are not obligated to raise a statute of limitations issue *nostra sponte*). Similarly, we find that courts are not obligated to investigate, *nostra sponte*, a petitioner's exhaustion of particular issues before the BIA.

that is sought is beyond his power to confer."); *Weinberger v. Salfi,* 422 U.S. 749, 767, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) ("In the present case the Secretary [of Health, Education, and Welfare] does not raise any challenge to the sufficiency of the allegations of exhaustion in appellees' complaint. We interpret this to be a determination by him that for the purposes of this litigation the reconsideration determination is 'final.' The named appellees thus satisfy the [statutory] requirements for ... judicial review....").[24]

Significantly, we have reached an analogous holding in the context of the exhaustion requirement of the Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, tit. VIII, § 803(d), 110 Stat 1321, 1321–71, 42 U.S.C. § 1997e(a), which provides that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of remedies under the PLRA is a mandatory requirement, yet we have distinguished it from "a jurisdictional predicate to our ability to hear the appeal." *Handberry v. Thompson,* 436 F.3d 52, 59 (2d Cir.2006); *see also Richardson v. Goord,* 347 F.3d 431, 433–34 (2d Cir.2003) (per curiam) (holding that exhaustion under the PLRA is not jurisdictional, but is nevertheless mandatory). Based on this distinction, we have found that "the failure to exhaust available administrative remedies is an affirmative defense that is waiveable." *Handberry,* 436 F.3d at 59 (internal quotation marks and alternations omitted).

We likewise hold here that even though 8 U.S.C. § 1252(d)(1) makes exhaustion of *administrative remedies* a predicate of our subject matter jurisdiction, the fact that the statute does not make exhaustion of *issues* a prerequisite for jurisdiction means that the failure to exhaust specific issues before the BIA is no more than an affirmative defense subject to waiver. *See generally Abbey v. Sullivan,* 978 F.2d 37, 43 (2d Cir.1992) (stating that the Social Security Act, 42 U.S.C. § 405(g), has a non-waivable, jurisdictional element as well as a waivable, prudential element).

In the instant case, we are confident that the purposes of our issue exhaustion

---

**24.** In this respect, we note that one rationale in these and other cases for permitting waiver, given agency silence, is particularly appropriate in the present context, where the BIA has invoked its streamlining procedures. An agency's silence on issue exhaustion may be deemed to constitute the agency's affirmative determination that it has conducted a fully adequate internal review of the claims brought before the court. *See Salfi,* 422 U.S. at 766–67, 95 S.Ct. 2457 ("While a court may not substitute its conclusion as to futility for the contrary conclusion of the Secretary, we believe it would be inconsistent with the congressional scheme to bar the Secretary from determining in particular cases that full exhaustion of internal review procedures [is] not necessary for a decision to be 'final' within the language of [the Social Security Act]."). In order to invoke the one-judge summary affirmance procedure, federal regulations require that the Board member to whom an appeal is assigned must, as a *threshold* matter, "determine[ ] that the result reached in the decision under review was correct [and] that any errors in the decision under review were harmless or nonmaterial." 8 C.F.R. § 1003. 1(e)(4)(i). These inquiries, according to the regulations, are undertaken independently from the Board member's assessment of whether the "factual and legal issues raised on appeal" are, themselves, insubstantial or squarely controlled by BIA precedent. *Id.* § 1003. 1(e)(4)(i)(A), (B). Hence, the streamlining procedures appear to contemplate a full review of the IJ's decision prior to determining whether the summary affirmance mechanism will be utilized. Indeed, this would appear to be the only way a Board member could determine whether any errors alleged in an appeal are nonetheless "harmless or nonmaterial" to the result reached by the IJ.

requirements have been served. The IJ, to whom all the matters before us were raised, was the source of the decision that we review, the full agency record is available to us, no additional factfinding is necessary, and the government is not concerned that the adversary proceedings below were incomplete. *See Salfi*, 422 U.S. at 765, 95 S.Ct. 2457 ("Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."); *United States v. Copeland*, 376 F.3d 61, 67 (2d Cir.2004) (stating that purpose of the administrative exhaustion requirement is to ensure that the agency has an opportunity to correct its errors and develop a full evidentiary record). *Cf. United States v. Perez*, 330 F.3d 97, 101 n. 2 (2d Cir.2003) (noting that, although the defendant, who sought collaterally to challenge his order of deportation, had failed to raise expressly an ineffective assistance of counsel claim before the BIA, the record reflected that "the BIA was fully aware of" the petitioner's contentions in that regard).

We conclude that neither a statutory mandate nor our prudential exhaustion doctrine requires that, where the government has waived issue exhaustion problems, we must exclude from our consideration those issues omitted from an appeal to the BIA.[25] And, in light of the government's silence on the matter of exhaustion, we invoke our discretion to excuse issue exhaustion in this case. Moreover, as further developed below, issues not raised to the BIA are essential to our view of the merits of Lin's appeal. While Lin argued to the BIA three important errors in the IJ's reasoning, his appellate brief to the agency left unchallenged a number of other bases for the IJ's adverse credibility determination. In such a case, where the IJ, in his adverse credibility finding, relies on multiple grounds, some of which are weak or erroneous, we must "review the totality of the IJ's decision," *Borovikova v. U.S. Dep't of Justice*, 435 F.3d 151, 161 (2d Cir.2006), and determine whether the IJ has articulated "an alternative and sufficient basis for her factual finding" that would render remand futile, *Li Hua Lin*, 453 F.3d 99, 2006 WL 1755289 at *6. In the present case, as again discussed below, Lin's petition for review to us successfully challenges several bases for the IJ's conclusions in addition to those Lin raised before the BIA. These challenges, which were not made to the BIA, when added to the errors articulated in Lin's BIA appeal, mean that we cannot be confident that "the agency would reach the same result upon a reconsideration cleansed of errors." *Id.*

### D. The Merits of Lin's Appeal

 Having found jurisdiction to consider in full the petition for review before

25. The dissent makes many powerful arguments for why rules of exhaustion are, and should be, mandatory. With these, we do not disagree. Indeed, we so hold. What the dissent does not explain is why, in this context, our circuit's specific rule requiring issue exhaustion—which is not derived from the text of § 1252(b)—should be understood as *jurisdictional*, despite the many disadvantages of such a designation, rather than merely mandatory. As discussed in this opinion, *supra* page 118, the Supreme Court has recently and powerfully warned us against conflating mandatory and jurisdictional requirements. *See Eberhart*, 126 S.Ct at 405. It seems to us prudent, consistent with what we have done in other areas of the law (*see supra* pages 118–19, 123–25), and properly deferential to the Supreme Court to make such exhaustion mandatory but not jurisdictional. Nothing in the dissent convinces us otherwise.

us, we evaluate all of the errors alleged. With respect to the IJ's adverse credibility finding, Lin challenges (a) the IJ's treatment of inconsistencies between Lin's 1994 and 2000 testimony, and (b) the IJ's analysis of some of Lin's corroborative documentation. In particular, Lin argues that the IJ erred (1) in his treatment of inconsistencies as to the hospital protest, (2) in his assertion of inconsistencies regarding Lin's wife's abortion and pregnancy dates, (3) in his finding of inconsistencies in the description of Lin's wife's period in hiding, (4) in his handling of Lin's household registration booklets, and, most importantly, (5) in his treatment of the question of whether Lin's wife's abortions were voluntary. In addition to these errors pertaining to credibility, Lin argues that the IJ improperly assessed the future risk of sterilization by overestimating the legal impact of Lin's planned divorce and by determining that forced sterilization was not an act of torture encompassed by the CAT.[26]

We address each of these arguments in turn, and find merit in several of Lin's contentions.

### 1. Inconsistencies regarding Lin's "protest" at the hospital

As he argued to the BIA, Lin first contends that the IJ exaggerated the difference between the 1994 and 2000 accounts of Lin's alleged protest at the hospital, and, as a result, erroneously relied upon those inconsistencies in doubting Lin's credibility concerning his wife's abortions. Although we are largely unpersuaded by Lin's efforts to minimize his shifting accounts of the hospital protest, we are nonetheless concerned by the IJ's holding that Lin's lack of credibility as to that event impugned Lin's account of his wife's forced abortions.

As a factual matter, the record supports the IJ's determination that the 1994 and 2000 versions of Lin's conduct at the hospital during his wife's second abortion were inconsistent.[27] As set forth above, Lin's

---

**26.** Lin makes one final argument that we find warrants little discussion. He challenges the IJ's treatment of his asylum, withholding, and CAT claims arising from his alleged illegal departure from China. Lin contends that he presented, through his own testimony and through the story of his neighbor who had allegedly been punished by the Chinese authorities for his own failed attempt to be smuggled from the country, credible evidence that he would be subject to future persecution and/or torture for his alleged violation of China's exit-entry laws. The IJ found Lin's testimony on his exit to be contradictory, and he suggested that Lin had in fact left China legally. Even if we were to agree with Lin that the IJ's factual finding overlooked Lin's explanation of his seeming testimonial inconsistencies on this matter, Lin did not present sufficient evidence to show that his illegal exit made it more likely than not that he would be tortured if returned to China. See Mu Xiang Lin v. U.S. Dep't of Justice, 432 F.3d 156, 160 (2d Cir.2005) (holding that, in the absence of a showing that someone in the petitioner's particular circumstances is more likely than not

to be tortured if imprisoned in China, CAT relief is not warranted).

**27.** We reject, in passing, the Respondent's suggestion that the IJ's credibility findings in this regard are owed the extraordinary level of deference ordinarily given to "demeanor" assessments. See, e.g., Zhou Yun Zhang, 386 F.3d at 73 ("A fact-finder who assesses testimony together with witness demeanor is in the best position to discern ... whether inconsistent responses are the product of innocent error or intentional falsehood."); Secaida–Rosales, 331 F.3d at 307 (distinguishing IJ credibility determinations that entail analysis of testimony from those based on assessment of witness demeanor, the latter of which are due greater deference). The decision of the IJ contains no findings that were specifically geared to Lin's behavior or demeanor during the December 2000 hearing, but is, rather, premised on the IJ's analysis of the consistency of Lin's testimony as compared to other record evidence. Hence, the Respondent's assertion that the "IJ properly relied on Lin's

1994 testimony—in particular the alleged participation of other individuals at the hospital and Lin's narrow escape from the authorities—differed from the 2000 account in which Lin was a solitary actor, was briefly detained, but was allowed to leave at the conclusion of his wife's surgery.

 Yet the identification of testimonial inconsistencies does not end our inquiry. As frequently has been held, while an IJ's application of the maxim *falsus in uno, falsus in omnibus* may at times be appropriate, an applicant's testimonial discrepancies—and, at times, even outright lies—must be weighed in light of their significance to the total context of his or her claim of persecution. *See Secaida–Rosales,* 331 F.3d at 308; *Diallo v. INS,* 232 F.3d 279, 288 (2d Cir.2000); *In re O–D–,* 21 I. & N. Dec. 1079, 1081–83 (BIA 1998); *see also Yongo v. INS,* 355 F.3d 27, 33 (1st Cir. 2004) ("Obviously there are some lies that, because of their circumstances and limited relationship to the main issue, do relatively little to discredit other statements."). Testimonial inconsistencies are not sufficient as the sole basis for an adverse credibility finding where the inconsistencies "do not concern the *basis for the claim of asylum or withholding,* but rather matters collateral or ancillary to the claim." *Secaida–Rosales,* 331 F.3d at 308 (emphasis added); *see also Borovikova v. U.S. Dep't of Justice,* 435 F.3d 151, 167 (2d Cir.2006).

This principle inherently includes a dimension of proportionality, *i.e.,* that the agency has properly assessed the scale of the inconsistency in the context of the balance of the alien's testimony. In *Alvarado–Carillo v. INS,* 251 F.3d 44 (2d Cir. 2001), we used the example that "one might easily and quickly characterize a

person shopping for groceries as 'forgetful' if, after being instructed to buy four specific grocery items, he or she failed to purchase one and got the wrong brand of another; on the other hand, the evaluation of a person making the same errors after an instruction to purchase twenty specific items would almost certainly not be the same." *Id.* at 51. In other words, the significance of an inconsistency can be overstated or understated if viewed in isolation, and overstatement is especially likely where the inconsistency bears little on the applicant's claim.

The legal significance of Lin's inconsistency regarding the hospital protest, therefore, depends on the basis of Lin's claim for asylum. When the agency reopened Lin's claim in 2000 in view of the amended definition of "refugee" under the INA, Lin's wife's forced abortions acquired new significance. As stated by the IJ himself, the "key issue" for Lin's reopened application was whether Lin was the spouse of a person who had been compelled to abort a pregnancy, within the meaning of *In re C–Y–Z–,* 21 I. & N. Dec. at 918, and the IJ made his adverse credibility finding regarding the hospital protest in the context of that claim. Forcible abortions of his wife's pregnancies, then, were the heart of Lin's claim in 2000, and the IJ's adverse credibility inferences regarding the incident at the hospital must be understood in that context. Thus situated, we find that the change in testimony regarding the scale of Lin's objection to government policy to have been a relatively minor discrepancy at the periphery of Lin's claim for relief. *See Diallo,* 232 F.3d at 288; *Secaida–Rosales,* 331 F.3d at 308.

---

non-responsive and evasive demeanor" is not supported by the record. We therefore afford the IJ's finding only the high degree of defer-

ence that is normally given to an IJ's factual determinations.

Significantly, as to the two alleged abortions and two threats of sterilization, Lin's testimony at both his 1994 and 2000 hearings was consistent except in the dating of the first abortion. Applying our reasoning in *Alvarado–Carillo*, Lin's consistency with respect to myriad details at the heart his claim for persecution is an important setting for assessing his credibility. *See* 251 F.3d at 51. And, as discussed below, the IJ found that Lin's wife's affidavit corroborated the occurrence of the forced abortions. The testimonial inconsistencies about the scope and details of Lin's behavior at the hospital—which might fatally undermine Lin's claim to asylum if based on episodes of anti-government conduct—were not sufficiently weighty to overcome the consistency of numerous core facts relating to Lin's claim for asylum based on his spouse's forced abortions. As a result, while we cannot deem erroneous the IJ's factual finding of testimonial embellishment with respect to Lin's expression of dissent at the hospital, we conclude that these testimonial differences cannot on their own bear dispositive weight with respect to Lin's claims that his spouse had been forced to abort two pregnancies.

2. *Inconsistencies regarding the chronology of Lin's wife's medical procedures*

The IJ did, however, provide other grounds for his adverse credibility finding. The IJ correctly noted that Lin's testimony in 2000 concerning his wife's abortions and IUD insertions had changed from 1994 in certain particulars. First, Lin's later testimony added several details, and in one instance corrected a date, regarding the insertion and removal of IUDs between his wife's pregnancies. Second, Lin gave a different date for his wife's first abortion. Lin acknowledged these variances, stating at the 2000 hearing that in 1994 he had been incorrect concerning the dates of certain events, and that in the interim, he had spoken to his wife, who had a better memory of the chronology, because they related to events that had affected her most directly. Lin now argues, as he did to the BIA, that the IJ erred in assessing these omissions and inconsistencies.

The legal significance of the omissions in Lin's 1994 testimony must be gauged in the light of what he was claiming at that hearing as against his claims in 2000. As discussed, at Lin's first hearing, the details concerning his wife's medical procedures were significantly less relevant to Lin's asylum claim in 1994, as Lin was not then claiming asylum based on the persecution of his spouse. *See Secaida–Rosales*, 331 F.3d at 308; *see also Mece v. Gonzales*, 415 F.3d 562, 575–76 (6th Cir.2005) ("If presented discrepancies cannot be viewed as attempts by the applicant to enhance his claim of persecution, they have no bearing on credibility."). The addition of further detail, and even improved accuracy, regarding the specific chronology of Lin's wife's abortions was a purpose of the reopened asylum hearing in 2000, and thus Lin cannot be penalized for adding new testimonial evidence with respect to those events.

As for Lin's correction of the date of his wife's first abortion and the date of the IUD insertion in 1992, his explanation is factually plausible—particularly in light of Lin's wife's corroborating affidavit, about which the IJ's decision expressed no doubts. This does not mean that the IJ had to believe the explanation, but, crucially, the IJ appears to have accepted it. The IJ stated: "[T]he Court can understand that the applicant's wife would be able to more accurately recall the dates when the IUDs were inserted and/or removed and when the abortions took place." Yet despite this acknowledgment, the IJ

found Lin not credible with respect to his wife's abortions.

We find that corrected dates as to one abortion and one IUD implantation are relatively minor inconsistencies in the context of an eight-year chronology involving four pregnancies, two births, two abortions, three IUDs, and two threats of sterilization. *See Alvarado–Carillo,* 251 F.3d at 51. Nevertheless, these discrepancies were not unimportant, in light of their proximity to the core of Lin's claim. *See Secaida–Rosales,* 331 F.3d at 308. If Lin had rested his case at this point, as he did before the BIA, he would have left unchallenged several other grounds for the IJ's adverse credibility finding—inconsistent testimony regarding his wife's hiding, conflict between testimony and the household registries, and background evidence indicating that his wife's abortions were voluntary. Under those circumstances, we would have been confident that the agency would have reached the same holding in the absence of errors. *See Li Hua Lin,* 453 F.3d 99, 2006 WL 1755289 at *6. But given our holding above with respect to exhaustion, we must consider the implications of the additional arguments raised in Lin's petition for review to us, and evaluate the possible futility of a remand in the light of the full sum of IJ errors. We therefore turn to the new arguments raised in Lin's petition for review.

### 3. *Lin's account of his wife's period of hiding*

The IJ's decision relied on the fact that Lin had testified at his reopened hearing that his wife had hidden six kilometers away with her mother, and that this testimony was inconsistent with Lin's wife's written statement that she had gone "far away" to hide with a friend. An examination of the transcript of the 2000 hearing, however, reveals that the IJ's description of Lin's testimony was inaccurate. Lin actually stated that his wife had hidden *both* with friends and with her mother. When the IJ subsequently asked Lin to explain the apparent discrepancy between his wife's characterization of her hiding place as "far away" and his statement that his mother-in-law lived six kilometers away, Lin stated again, in conformity with his initial testimony, that his wife had hidden in multiple locations. On this record, we find the IJ's characterization of Lin's and his wife's stories on this matter as inconsistent to be unsupported by the record. *See Chung Sai Zheng v. Gonzales,* 440 F.3d 76, 80 (2d Cir.2006).

### 4. *The household registries*

The IJ also erred, at least in part, in finding discrepancies between Lin's testimony and the household registries submitted as corroborating evidence. The IJ observed that the registries appeared to show that Lin's second son, born in 1986, whom Lin stated was registered only after the payment of a 6,000 yuan fine in December 1990, had in fact been registered with the other members of the family on February 15, 1990. That this date is inconsistent with Lin's testimony (1) that the fine was paid in December 1990, and (2) that his second son was not registered until after the payment, is clear. But the existence of *both* sons, and the violation of the one-child policy that the second birth constituted, is corroborated by Lin's testimony in 1994 and by Lin's wife's affidavit, which the IJ appeared, in large measure, to credit. Furthermore, there is no inconsistency as to the fine required to register that son, nor as to his registration some four years after his birth. As a result, this discrepancy appears to be the sort of "collateral" detail that the IJ can consider, but that should not, in itself, undercut Lin's central claims concerning his wife's abor-

tions and his own threatened sterilization. *See Secaida–Rosales,* 331 F.3d at 308.

■ More troubling to the validity of the IJ's ultimate conclusions are the IJ's comments regarding a "second" household registry, which was *not* admitted into evidence and which, with the exception of dates written in Arabic numerals, was written entirely in Chinese. The IJ stated in his decision that, although he could not read this second registry, he was able to determine from the dates that it was inconsistent with the translated document that was admitted into evidence. The first problem with this finding is the IJ's reliance on non-record evidence, which the BIA has prohibited. *See In re S–M–J–,* 21 I. & N. Dec. 722, 728 (BIA 1997) (stating, in the context of a country report not included in the record, that "any evidence relied upon by the Immigration Judge must be included in the record so that the Board can meaningfully review any challenge to the Immigration Judge's decision on appeal"). But, even were we to ignore the failure to put the registry in the record, it is patently improper to draw conclusions from a document written in a foreign language in the absence of a certified translation. *See Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984); 8 C.F.R. § 103.2 ("Any document containing foreign language submitted to the Service shall be accompanied by a full English language translation which the translator has certified as complete and accurate, and by the translator's certification that he or she is competent to translate from the foreign language into English.").

Such conclusions cannot be treated as reliable. This lack of reliability is borne out by our own examination of the Arabic numerals legible on the untranslated household registry. To us, this document reveals no apparent discrepancies that might warrant the IJ's findings. The IJ's

conclusion concerning this second registry is, therefore, not supported by the evidence. Moreover, we cannot avoid the concern that the IJ's apparent problems with this untranslated registry might have affected, inappropriately, the weight he placed on the earlier-described discrepancy regarding the registration of Lin's second son.

5. *The voluntariness of Lin's wife's abortions*

Most important, because central to the viability of Lin's claims in 2000, we conclude that the IJ's determination that Lin's wife's abortions must have been voluntary, rather than forced, was not supported by substantial evidence. In drawing this inference, the IJ relied on the contents of a State Department country report indicating that the issuance of abortion certificates (which Lin testified he had received but had lost) occurred only in cases of voluntary abortions. In so stating, the IJ gave no indication of the year of the country report to which he was referring. Accordingly, we must assume that he was referring to the 1999 State Department report, which was the only one included in the administrative record. But we have found no discussion of abortion certificates in this report.

Moreover, even if such evidence were in that report, we would think that where the claim is one of past persecution, it is unreasonable to draw inferences regarding the circumstances of abortions performed in 1990 and 1991 based upon a report prepared nearly a decade later. And this is so quite apart from our frequently-stated caution that State Department reports cannot be presumed to "present[ ] the most accurate picture of human rights in the country at issue," and that such reports "do not automatically discredit contrary evidence presented by [an asylum]

applicant." *Tian–Yong Chen v. INS*, 359 F.3d 121, 130 (2d Cir.2004).

It follows that the IJ did not have before him reliable evidence upon which to base his conclusion that Lin's wife's abortions were voluntary, rather than forced as she attested in an affidavit which the IJ found, on the whole, to be credible.

### 6. *The future threat of sterilization*

Finally, we turn to the two grounds stated by the IJ for rejecting Lin's contention that he faced sterilization if removed to China: (1) that Lin's divorce removed the threat of any such procedure, and (2) that, in connection with Lin's claim for CAT relief, sterilization is not tantamount to torture. As to the first, we note that the transcript of the January 31, 2001 hearing indicates that the IJ became aware of Lin's divorce proceedings only minutes before his oral decision was rendered, and that, upon receiving this information from Lin's attorney, the IJ made no further inquiry into the matter. We think it evident that an inquiry would need to be conducted in order to assess reliably, at the least, (a) whether the divorce proceedings had, in fact, been concluded, and (b) whether China's family planning officials sought to sterilize Lin in order (I) to prevent further childbearing specifically from *this*—now, perhaps terminated—*marriage*, (ii) to preclude *any future procreation* by an individual who already had

two sons, or, finally, (iii) to *punish Lin* for his prior violations of the one-child policy. On the current record, the IJ's assessment of the impact of Lin's divorce on his sterilization claim cannot be said to be supported by substantial evidence.[28]

Regarding the IJ's determination that a threat of torture could not be made out by a proved claim of forced sterilization, our capacity to review this legal conclusion is compromised by the IJ's silence as to the analytical basis for it. *See Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 191 (2d Cir.2005). In any event, we need not decide the question of whether involuntary sterilization pursuant to China's population control policy meets the definition of torture adopted by the CAT. Because the IJ's legal conclusion that threatened sterilization does not warrant CAT relief was unsupported by any reasoning whatsoever, *see, e.g., Yu Sheng Zhang*, 362 F.3d at 158–59 (discussing the need for "sufficient reasoning" in a summarily affirmed IJ opinion so as to permit judicial review), we must vacate the IJ's determination on this issue and remand it to the BIA. It is for that agency to decide, in the first instance, whether and how the merits of the question should be considered.[29]

\* \* \* \* \* \*

Thus, with respect to Lin's claims (a) for asylum and withholding of removal on the basis of his wife's alleged forcible abortions and his asserted threatened sterilization,

---

**28.** Because the IJ did not reach a factual conclusion about Lin Zhong's potential divorce, we need not inquire as to the legal significance of a divorce for a petitioner claiming asylum based on family planning violations. But we note that the BIA has never spoken to the legal significance of a divorce on such asylum claims. *See generally Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 191–92 (2d Cir.2005) (remanding a petition for review to the BIA where the agency had failed to articulate a reasoned basis for summarily affirming an IJ's decision, and

where the agency had not yet established whether, when, and why boyfriends and fiancés might qualify as refugees).

**29.** This is especially applicable when, as here, the question concerns a novel interpretation of immigration statutes, given that we accord *Chevron* deference to the BIA interpretations, but do not to IJ readings. *See Shi Liang Lin v. U.S. Dep't of Justice*, 416 F.3d 184, 191 (2d Cir.2005).

and (b) his CAT claim based on his alleged threatened sterilization, we find any number of errors in the IJ's determination that Lin was not credible and was not at risk of future sterilization.

There are, to be sure, valid grounds on the basis of which the Executive Office of Immigration Review (the body encompassing the BIA and the immigration courts) might conclude that the purported forcible abortions and especially the threat of sterilization did not occur. For instance, one inconsistency in Lin's testimony regarding the chronology of his alleged past persecution in China is not explained by his wife's superior memory of the dates of IUD insertions and abortions. As described early in this opinion, and as noted by the IJ, Lin testified in 1994 that, following his wife's first abortion and in order to avoid government-ordered sterilization, he had fled into hiding for a period of three months. In 2000, however, Lin testified that he was in hiding for only approximately ten days. While this discrepancy has no obvious relationship to the issue of whether Lin's wife underwent forced abortions, it does bear directly on the credibility of Lin's alleged attempts to avoid sterilization.

But the IJ did not make this or any other finding of dubiety with respect to Lin's sterilization claim. The IJ's entire discussion of the discrepancies between Lin's 1994 and 2000 testimony referred only to the issue of Lin's wife's forced abortions. And, the IJ made no mention of any additional credibility problems tied to Lin's claimed fear of future sterilization. Cf. Secaida–Rosales, 331 F.3d at 305

("[O]ur review [is] confined to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA."). As we said in Jin Shui Qiu, 329 F.3d at 149, "[r]ules of law ... require the BIA to elucidate the basis for its factual conclusions.... BIA errors of law are not excused by the fact that a hypothetical adjudicator, applying the law correctly, might also have denied the petition for asylum, nor can factual findings supporting such a denial be assumed on the basis of record evidence not relied on by the BIA." Accordingly, we cannot supplement the underlying agency decision with our own conclusions.

That said, the inconsistencies discussed in the IJ's decision did address Lin's general credibility in ways that cannot be ignored. As such, they might also affect his claim that his wife was subjected to two forcible abortions, and this is so despite the high level of overall testimonial consistency regarding these events. And, were Lin's testimony the only basis for this claim, we might find that despite the IJ's errors, a remand to the BIA on this claim would be futile. See Li Hua Lin, 453 F.3d 99, 2006 WL 1755289 at * 6. But the forced abortions claim is also based in significant part on Lin's wife's affidavit, which—once the IJ's errors are excised—cannot be discounted. As a result, we do not "have confidence that the agency would reach the same result upon a reconsideration cleansed of errors."[30] Id. Nor is it the case that the IJ offered an "alternative and sufficient basis," separate from his errors, on which his conclusions as to

---

30. We note that "the question of in *whose* decision we must have confidence on remand remains a potentially complicated one...." *Li Hua Lin*, 453 F.3d 99, 2006 WL 1755289 at *6, n. 7 (emphasis in original); *see also Li Zu Guan*, 453 F.3d 129, 2006 WL 1776717 at *6, n. 11 (noting that the answer to the question posed in *Li Hua Lin* may turn on whether the object of the futility inquiry is to make "a prediction, based on the record, about what the result of a remand would be," or "to understand the role that the various errors played in the decision under review, and deny[ ] the petition only where we are satisfied that the errors were not a contributing cause of the denial of relief.").

the alleged forced abortions could rest. *Cao He Lin,* 428 F.3d at 401.

Viewing the case as a whole, we cannot say that the IJ made findings that are supported by sufficient evidence to rule out Lin's claim of fear of sterilization based on past threats of such sterilization. Nor can we say that the claim that Lin's wife was subjected to forcible abortions has been rejected on the basis of error-free record evidence. And we are not confident that a remand of these claims to the BIA—on the standards stated in *Cao He Lin, Xiao Ji Chen, Li Hua Lin,* and *Li Zu Guan*—would be futile.

We therefore must vacate the decision and remand to the BIA for further proceedings.

## III. Conclusion

For the foregoing reasons, Lin's petition for review is GRANTED. The decision of the BIA is VACATED, and Lin's abortion- and sterilization-related claims for asylum, withholding, and CAT relief are REMANDED to the BIA for further proceedings not inconsistent with this opinion. For the reasons stated in note 20, *supra,* the BIA's affirmance of the IJ's rejection of Lin's arguments arising from Lin's alleged illegal departure from China is AFFIRMED.

KEARSE, Circuit Judge, dissenting.

I respectfully dissent. I would deny the petition for review because the only issues presented here that were exhausted through presentation to the Board of Immigration Appeals ("BIA" or the "Board"), as required by 8 U.S.C. § 1252(d)(1), do not show a basis for overturning the decision of the BIA.

The majority, in vacating the BIA decision and ordering a remand, concedes that the issues raised in the petition for review that were presented to the BIA do not warrant relief. *See, e.g.,* Majority Opinion *ante* at 118 ("Several issues raised in [Lin's] petition ... were not included in Lin's brief on appeal to the BIA, and ... they alter the proper disposition of Lin's petition for review."); *id.* at 125 ("[The] issues not raised to the BIA are essential to our view of the merits of Lin's appeal.").

But the majority holds that this Court has jurisdiction to review issues that were not raised in a petitioner's appeal to the BIA. *See, e.g.,* Majority Opinion *ante* at 121–22 ("[I]n the context of 8 U.S.C. § 1252(d)(1), the failure to exhaust individual issues before the BIA does not deprive this court of *subject matter jurisdiction* to consider those issues." (emphasis in original)). With all due respect, I disagree.

Section 1252(d)(1), enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), provides that "[a] court may review a final order of removal *only if* ... (1) the alien has exhausted all administrative remedies available to the alien as of right ...." 8 U.S.C. § 1252(d)(1) (emphasis added). "Statutory exhaustion requirements such as § 1252(d)(1) are 'mandatory, and courts are not free to dispense with them.'" *Foster v. INS,* 376 F.3d 75, 77 (2d Cir.2004) (quoting *United States v. Gonzalez–Roque,* 301 F.3d 39, 47 (2d Cir.2002)). We have generally held that this provision means that we lack jurisdiction to review an issue that was not presented to the BIA. *See, e.g., Foster,* 376 F.3d at 78 ("To preserve a claim, we require '[p]etitioner to raise *issues* to the BIA in order to preserve them for judicial review.'" (quoting *Cervantes–Ascencio v. INS,* 326 F.3d 83, 87 (2d Cir.), *cert. denied,* 540 U.S. 990, 124 S.Ct. 483, 157 L.Ed.2d 386 (2003) (emphasis in *Foster* ))). "We have been nothing if not clear in requiring that a party

may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself." *Foster*, 376 F.3d at 78 (internal quotation marks omitted); *id.* at 77 (A "failure to exhaust [as required by § 1252(d)(1)] constitutes a clear jurisdictional bar." (internal quotation marks omitted)).

I disagree with the majority's apparent view that *Foster* was somehow eroded by *Abimbola v. Ashcroft*, 378 F.3d 173, 180 (2d Cir.2004), a view reflected in the majority's statement that "in *Abimbola* [,] . . . decided shortly after *Foster* · and by the same panel, *we expressly treated as an open question the jurisdictional effect of a lack of issue exhaustion* in a situation in which the government had seemingly waived objection." Majority Opinion *ante* at 119 n. 19 (emphasis added). This description by the majority assumes lack of exhaustion; however, the uncertainty as to our jurisdiction in *Abimbola* arose precisely because there was a question as to whether exhaustion was lacking. The petitioner in *Abimbola* had in fact presented the pertinent issue to the BIA. The problem was that he had not raised the issue before the Immigration Judge ("IJ") and that the BIA had not addressed it. We noted that those circumstances "present[ed] an open question as to whether we have jurisdiction over this claim *since Abimbola may not have properly exhausted his administrative remedies as required by 8 U.S.C. § 1252(d)."* *Abimbola,* 378 F.3d at 180 (emphasis added). Accordingly, the doctrinal question identified in *Abimbola* was not, as the majority would have it, whether lack of issue exhaustion is jurisdictional; rather, it was whether a petitioner's failure to raise an issue prior to raising it to the BIA, together with the BIA's failure to address that issue, *constitutes* a lack of exhaustion.

Nor do I read *Abimbola* as stating that the government had waived or could waive the issue-exhaustion requirement. Although noting that the government "ha[d] not offered a jurisdictional objection based on an exhaustion argument for this claim," we clearly considered the possible absence of exhaustion to present a "jurisdictional issue." 378 F.3d at 180. We stated that "it would be unwise" to decide the "particularly difficult and complex" "jurisdictional issue" presented by the possibility that a petitioner's raising an issue before the BIA without having raised it to the IJ, where the BIA's ruling does not address the issue, may not constitute the required exhaustion, "without the benefit of argument from both sides." *Id.* Since the jurisdictional constraint is not constitutional but statutory, allowing the "exercise [of] hypothetical jurisdiction," and since we found it "clear that Abimbola's claim ... [wa]s meritless, we assume[d] jurisdiction to decide the issue but t[ook] no position as to whether Abimbola met the exhaustion requirement in § 1252(d)." *Id.*

In sum, I view the above passages of the *Abimbola* opinion as clearly indicating—consistently with the principles enunciated shortly theretofore by the same panel in *Foster*—that if it were established that Abimbola did not properly exhaust his administrative remedies on the pertinent issue as required by § 1252(d), this Court would not have jurisdiction to consider that issue.

Most importantly, I disagree with the position taken by the majority that § 1252(d)(1)'s requirement that the alien have "exhausted all administrative remedies available to the alien as of right" means simply that we have jurisdiction to consider any issue argued in the alien's petition to this Court for review, regardless of whether it was presented to the BIA, "so long as a decision has been ren-

dered on his application by an IJ *and* appealed to the BIA—the two administrative remedies available to him as of right." Majority Opinion *ante* at 118 (emphasis in original). I believe this disregards the purposes and meaning of exhaustion. "[A]t least one of the purposes served by the exhaustion requirement contained in § 1252(d) is to ensure that the INS, as the agency responsible for construing and applying the immigration laws and implementing regulations, has had a full opportunity to consider a petitioner's claims before they are submitted for review by a federal court." *Theodoropoulos v. INS,* 358 F.3d 162, 171 (2d Cir.), *cert. denied,* 543 U.S. 823, 125 S.Ct. 37, 160 L.Ed.2d 34 (2004). This purpose is not served if an issue raised in the petition for review has not been presented to the Board.

Nor does exhaustion of all available remedies mean simply obtaining a final order. In considering the Prison Litigation Reform Act's requirement that a prisoner not bring a court action complaining of prison conditions "until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a), the Supreme Court in *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), observed that one cannot literally "exhaust" a "remedy"; rather, one is required to exhaust the procedures that could lead to the requested relief:

> While the modifier "available" requires the possibility of some relief for the action complained of ... , *the word "exhausted" has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered.* It would, for example, be very strange usage to say that a prisoner must "exhaust" an administrative order reassigning an abusive guard before a prisoner could go to court and ask for something else .... *It makes no sense to demand that someone*

*exhaust "such administrative [redress]" as is available; one "exhausts" processes, not forms of relief ....*

*Id.* at 738–39, 121 S.Ct. 1819 (brackets in original) (emphases added). Thus, I view § 1252(d)(1)'s similar provision that we may not review an order of removal unless the alien has "exhausted all administrative remedies available to the alien as of right" as meaning that the alien must have pursued all of the procedures available to him in the BIA proceeding in connection with his requests for relief, *i.e.,* presented to the BIA all of the issues he wishes to press in his petition for review, not simply that he must have obtained a final administrative decision.

The view that § 1252(d)(1) restricts the jurisdiction of the courts of appeals to issues that the alien has presented to the BIA has been the prevailing interpretation by the federal courts of appeals that have discussed the question. *See, e.g., Foster,* 376 F.3d at 77–78; *Cervantes–Ascencio v. INS,* 326 F.3d at 87 ("Despite exhaustion requirements requiring Petitioner to raise issues to the BIA in order to preserve them for judicial review, *see* 8 U.S.C. § 1252(d)(1), Petitioner failed to do so on this specific issue. Accordingly, we may not consider it on appeal."); *Zhang v. INS,* 274 F.3d 103, 107 (2d Cir.2001) ("a litigant is generally not entitled to judicial review of a contention not argued to the Board, *see* § 1252(d)(1)"); *Alyas v. Gonzales,* 419 F.3d 756, 762 (8th Cir.2005) ("Because [petitioner] failed to present [his due process] argument to the BIA in the first instance, we lack jurisdiction to decide the claim." (citing 8 U.S.C. § 1252(d)(1))); *Zara v. Ashcroft,* 383 F.3d 927, 930 (9th Cir.2004) ("A petitioner cannot satisfy the exhaustion requirement by making a general challenge to the IJ's decision, but, rather, must specify which issues form the basis of the appeal."); *Ramani v. Ashcroft,* 378

F.3d 554, 560 (6th Cir.2004) ("only claims properly presented to the BIA and considered on their merits can be reviewed by this court"); *Xie v. Ashcroft,* 359 F.3d 239, 245 n. 8 (3d Cir.2004) ("we are without jurisdiction to decide [an] issue" as to which "[p]etitioner brings [an] argument for the first time"); *Fernandez–Bernal v. Attorney General,* 257 F.3d 1304, 1317 n. 13 (11th Cir.2001) (petitioner "failed to raise this issue before the BIA and, as a result of that failure, we do not have jurisdiction to consider it here. *See* 8 U.S.C. § 1252(d)(1)"); *Sousa v. INS,* 226 F.3d 28, 31 (1st Cir.2000) ("Obviously, [the petitioner] has gone *through* the administrative proceeding; the problem is that he did not raise there the issue he now seeks to raise in this court." (emphasis in original)); *Singh v. Reno,* 182 F.3d 504, 511 (7th Cir.1999) ("Generally, ... an alien who fails to raise an issue below has not fulfilled [§ 1252(d)'s] exhaustion requirement."); *Witter v. INS,* 113 F.3d 549, 554 (5th Cir.1997) ("We have no jurisdiction to consider issues that were not presented to or considered at the administrative level on appeal.").

Further, 8 U.S.C. § 1105a(c) (1994), the predecessor to § 1252(d)(1), included a similar exhaustion requirement, stating that an order of deportation "shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c) (1994). The prevailing interpretation of § 1105a(c) was that it required the alien to present to the BIA any issue as to which he would thereafter seek review in court. *See, e.g., Etchu–Njang v. Gonzales,* 403 F.3d 577, 582 (8th Cir.2005) ("At least seven circuits, including ours, read former § 1105a(c) to require an alien to exhaust both remedies *and* issues before the agency ...." (emphasis in original)); *Sousa v. INS,* 226 F.3d 28,

31–32 (1st Cir.2000) ("[M]ost circuits, including this one, have described former [§ 1105a(c)] as a jurisdictional bar where an issue sought to be raised in court was not raised in the agency."); *Der–Rong Chour v. INS,* 578 F.2d 464, 468 (2d Cir. 1978), *cert. denied,* 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979) (petitioner "never previously presented his ... theory [of eligibility for relief pursuant to a consent decree] to the Board, which precludes review of that claim here"); *Margalli–Olvera v. INS,* 43 F.3d 345, 350 (8th Cir.1994) ("[C]ourts of appeals have consistently applied [§ 1105a(c)] as a bar to review of issues not raised before the BIA."); *Ascencio v. INS,* 37 F.3d 614, 615–16 (11th Cir.1994) ("Under ... 8 U.S.C. § 1105a(c), a court lacks jurisdiction to consider a claim which has not first been presented to the Board ...."); *Ravindran v. INS,* 976 F.2d 754, 761 (1st Cir.1992) ("Issues not raised before the Board may not be raised for the first time upon judicial review of the Board's decisions.... [This] requirement is jurisdictional."); *Rivera–Zurita v. INS,* 946 F.2d 118, 120 n. 2 (10th Cir.1991) ("The failure to raise an issue on appeal to the Board constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of Appeals of jurisdiction to hear the matter."); *Vargas v. INS,* 831 F.2d 906, 907–08 (9th Cir.1987) ("Failure to raise an issue in an appeal to the BIA constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter."); *Ka Fung·Chan v. INS,* 634 F.2d 248, 258 (5th Cir.1981) (Petitioner "failed to raise [his estoppel] claims before the BIA. Under 8 U.S.C. § 1105a(c), this failure to exhaust administrative remedies precludes review of his estoppel arguments in this court.").

I have seen nothing in the legislative history to indicate that in enacting IIRI-

RA, Congress meant to expand the jurisdiction of the courts of appeals to entertain petitions for review of orders of removal, and I thus think it appropriate to infer that Congress did not intend to alter the prevailing principle that the courts lacked jurisdiction to consider issues not raised in the proceedings before the BIA. As the Eighth Circuit noted in *Etchu–Njang v. Gonzales,*

> it is "appropriate to assume that our elected representatives, like other citizens, know the law," *Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and to recognize that "longstanding acceptance by the courts [of a judicial interpretation], coupled with Congress' failure to reject that interpretation, argues significantly in favor of accept[ing] it." *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 602, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (internal quotation omitted) (alteration in original); *see also Sutherland Statutory Construction* § 22:33, at 399 (6th ed. 2002) ("[T]he legislature is presumed to know the prior construction of the original act, and if words or provisions in the act or section amended that had been previously construed are repeated in the amendment, it is held that the legislature adopted the prior construction of the word or provision."). Whatever the merits of the textual interpretation of § 1105a(c) by the courts prior to the IIRIRA, *there is a strong inference that in reenacting the same exhaustion language, Congress intended to continue a statutory requirement that an alien exhaust not only remedies, but also issues, before he may obtain judicial review.*

403 F.3d at 582 (emphasis added).

Finally, to the extent that the majority suggests that its ruling—that the § 1252(d)(1) exhaustion requirement does not apply to issues—is limited to those cases in which the BIA's decision was a summary affirmance entered in accordance with the Board's streamlining procedures, *see* Majority Opinion *ante* at 122, I do not see that those procedures alter the thrust of the statutory provision's exhaustion requirement. The BIA's decision whether to apply the streamlining procedures in a given case depends on the issues presented for appeal, *see* 8 C.F.R. §§ 1003.1(d) and (e), and the issues for appeal must be stated by the appellant at the outset:

> The party taking the appeal *must identify the reasons for the appeal in the Notice of Appeal ... or in any attachments thereto,* in order to avoid summary dismissal .... The statement *must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged.* If a question of law is presented, *supporting authority must be cited.* If the dispute is over the findings of fact, *the specific facts contested must be identified.*

*Id.* § 1003.3(b) (emphases added). Thus, "the decision whether to streamline is affected by what issues the petitioner chooses to appeal to the BIA. The failure to include issues may result in a decision to streamline which otherwise would not have been made." *Zara v. Ashcroft,* 383 F.3d at 931.

In sum, the majority holds that "the language" of "§ 1252(d)(1) does not make issue exhaustion a statutory jurisdictional requirement," because, the majority says, that section "does not expressly proscribe judicial review of *issues not raised in the course of exhausting all administrative remedies.*" Majority Opinion *ante* at 120 (emphasis added). Given the present context, to wit, issues presented in a petition for review, I regard the phrase "issues *not* raised *in the course of exhausting all* administrative remedies" (emphases added) as an oxymoron. In my view, the very fact

that the issues have not been raised in the course of the administrative proceeding means that, as to those issues, the petitioner has *not* exhausted all administrative remedies.

Finally, as to the explanations given by the majority in its initial, "clarify[ing]," footnote, Majority Opinion *ante* at 107 n. 1, which follows its statement that the "[jurisdictional] question is determinative of the ... case before us," *id.* at 107, I have several observations. I question whether this Court actually has the power to remedy even a manifest injustice when we lack jurisdiction. Further, statements as to what our Court must do in circumstances differing from those here are purely dicta. And it strikes me as odd for the majority to state that it "expects that virtually no case will be decided differently from the way it would be were the [exhaustion] requirement deemed jurisdictional," *id.* at 108 n. 1, considering that the instant matter is precisely such a case.

For all of the foregoing reasons, I dissent.