11-1607-ag (L)
Rosario-Mijangos v. Holder

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――

August Term, 2012

(Argued: October 4, 2012     Decided: May 16, 2013)

Docket Nos. 11-1607-ag; 11-5123-ag

―――――――――

LEONEL ROSARIO-MIJANGOS,

*Petitioner*,

— v. —

ERIC H. HOLDER, JR., United States Attorney General,

*Respondent*.

―――――――――

B e f o r e:

WALKER, LYNCH, and LOHIER, *Circuit Judges*.

―――――――――

Petitioner, a citizen of Mexico, seeks review of a Board of Immigration Appeals decision denying his application for cancellation of removal. Prior to commencement of the underlying immigration proceedings, petitioner had two encounters with border patrol agents, each of which resulted in his "voluntary return" to Mexico. We hold that the immigration judge reasonably found that during each of those well-documented encounters, petitioner knowingly and voluntarily conceded his removability, waived his

right to appear before an immigration judge, and chose to leave the United States in lieu of more formal proceedings. We further hold that petitioner's return to Mexico under those circumstances severed his continuous physical presence in the United States, rendering him ineligible for cancellation of removal. Finally, we deny petitioner's appeal of the denial of his motion to reopen proceedings.

DENIED.

ANNE E. DOEBLER, Anne E. Doebler, P.C., Buffalo, N.Y., *for Petitioner*.

JAMES E. GRIMES, Senior Litigation Counsel (Stuart F. Delery, Acting Assistant Attorney General; Linda S. Wernery, Assistant Director, *on the brief*), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington D.C., *for Respondent*.

GERARD E. LYNCH, *Circuit Judge*:

Leonel Rosario-Mijangos, a citizen of Mexico, seeks review of a Board of Immigration Appeals ("BIA") decision denying his application for cancellation of removal. To establish eligibility for cancellation of removal, Rosario-Mijango must show, among other things, that he maintained at least ten years of "continuous physical presence" in the United States immediately prior to his application. See Ascencio-Rodriguez v. Holder, 595 F.3d 105, 110 (2d Cir. 2010); 8 U.S.C. § 1229b(b)(1)(A). He was able to demonstrate this continuous presence except for two encounters with U.S. Border Patrol in 2007, each of which resulted in what the parties term Rosario-Mijangos's

2

"voluntary return" to Mexico. The question before us is whether those "voluntary returns" were the result of a formal, documented process in which Rosario-Mijangos was found inadmissible, which would sever his continuous physical presence and render him ineligible for cancellation of removal. We hold that they did.

## BACKGROUND

On September 29, 2007, Rosario-Mijangos was served with a notice to appear pursuant to 8 U.S.C. § 1229(a)(1). The notice alleged that he had entered the United States on September 17, 2007 without being admitted or paroled after inspection by an immigration officer, and that he was therefore removable under 8 U.S.C. § 1182(a)(6)(A)(i). In removal proceedings, Rosario-Mijangos admitted these allegations, but he applied for cancellation of removal under 8 U.S.C. § 1229b(b)(1). That provision authorizes the Attorney General to "cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States" where, inter alia, the alien "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application," id. § 1299b(b)(1), (1)(A). The government argued that Rosario-Mijangos was not eligible for cancellation of removal because of what it deemed a break in the continuity of his physical presence in the United States that occurred in the summer of 2007. An immigration judge ("IJ") conducted a hearing to determine whether Rosario-Mijangos was eligible.

3

I.      Rosario-Mijangos's Testimony

At the hearing, Rosario-Mijangos testified that he had first entered the United states, illegally, in October 1994, when he was 13 years old.  He has now, and had in the summer of 2007, a wife and two children, all of whom are United States citizens.  On July 22, 2007, Rosario-Mijangos left the United States to visit relatives in Mexico.  He attempted to return on August 29, 2007, along with several other individuals, but he and his companions encountered immigration officials one day after crossing the border.  The officials brought them to a processing center, where they took Rosario-Mijangos's photograph and fingerprints.

At the hearing, Rosario-Mijangos was presented with two documents, a Form I-213, a "Record of Deportable/Inadmissible Alien," and a Form I-826, a "Notice of Rights and Request for Disposition."  Both forms were dated August 30, 2007.  The latter was written in Spanish, which Rosario-Mijangos can read, and it bore his signature.  Above the signature, and under the heading, "Request for Disposition," were three paragraphs of text.  To the left of each paragraph was a box in which a checkmark might be placed and a space for initials.  The first two paragraphs stated, respectively, in Spanish: "I request a hearing before the Immigration Court to determine whether or not I may remain in the United States."; and "I believe that I would face harm if returned to my country.  My case will be referred to an immigration court for a hearing."  The third paragraph, also in Spanish, read:

> I admit that I am in the United States illegally. I don't believe
> I will face harm if I return to my country. I wa[i]ve my right
> to a hearing before the Immigration Court. I wish to return to
> my country as soon as arrangements can be made for my
> departure. I understand that I may be held in detention until
> my departure.

The box to the left of the third paragraph contained an "x"; "L.R.," Rosario-Mijangos's initials, were written in the space next to it; and a circle had been drawn around the checked box and the initials. No such markings appear next to the first two paragraphs. Rosario-Mijangos acknowledged that he had signed the Form I-826, but denied that he had read it before signing. He further testified that the circle was already on the paper when it was shown to him, and he was instructed to put his initials inside it. He said he did not draw the "x."

Rosario-Mijangos also denied that he had provided the information contained on the Form I-213, for example that he had entered the United States to seek employment, or that he was single. He claimed that the officials interviewed his companions before interviewing him, and that they had entered the same information on everyone's forms. According to Rosario-Mijangos, an agent explained only that he was being sent back to Mexico and instructed him to sign the Form I-826.

Rosario-Mijangos testified that he had wanted a hearing before an immigration judge, but he did not ask for one. He explained that one of his companions had requested a hearing, and that he overheard an official telling this companion that he would be deported if he went before a judge. After a few hours in the processing center, the

5

immigration officers took Rosario-Mijangos to the border so that he could cross back into Mexico.

Several days later, on September 2, 2007, Rosario-Mijangos again entered the United States and again encountered immigration officials. He was brought back to the processing center. An officer asked his name, took his photograph and fingerprints, and told him he would be sent back to Mexico. Rosario-Mijangos was presented at the hearing with a second set of documents, again a Form I–213 and a Form I-826, both dated September 4, 2007. Once again, the Form I-213 indicated that Rosario-Mijangos had entered the United States seeking employment, which he denied telling the officers. Also as before, the third paragraph on the Form I-826 was initialed and marked with an "x," and the form bore Rosario-Mijangos's signature. As with the previous Form I-826, Rosario-Mijangos admitted writing the initials but not the "x," which he claimed was on the paper at the time it was handed to him.

Rosario-Mijangos testified that he was told he would be returned to Mexico, and that he was instructed to sign and initial the paper without reading it, that no one informed him he could see an immigration judge, and that he never asked to see one. This time, Rosario-Mijangos spent a day at the processing center before he was returned to the border and crossed back into Mexico. On September 7, 2007, Rosario-Mijangos successfully reentered the United States without encountering any immigration officials.

II.     Agent Braulio Garza's Testimony

Two border patrol agents also testified at the hearing.  The signature of the first, Braulio Garza, appears on the I-213 and I-826 forms dated August 30, 2007.  Garza acknowledged that he did not have any specific memory of the encounter with Rosario-Mijangos or of completing the forms but testified that he must have filled them out because he recognized his own signature.  Garza said that his job in August 2007 was to respond to agents who had detained individuals such as Rosario-Mijangos, and he testified to his usual practices during that time.

Garza testified that, after responding to the agent who had detained Rosario-Mijangos, he would have brought Rosario-Mijangos back to the station and interviewed him individually to obtain biographical information, which he would then have used to complete the Form I-213.  Garza explained that Rosario-Mijangos must have told him he was single, because Garza entered information to that effect on the Form I-213.  Garza also noted that he must have informed Rosario-Mijangos that he could make a phone call if he wanted to, because Garza had placed his initials and the date next to a statement on the Form I-213 that read, "Alien has been advised of communication privileges."  After the Form I-213 was completed, Garza testified, he would have fingerprinted and photographed Rosario-Mijangos and entered his information into IDENT, a computer database operated by the Department of Homeland Security ("DHS"), before moving on to complete the Form I-826, which he referred to as "the voluntary return form."

7

Garza testified that it was his standard practice in August 2007 to ask any alien completing a Form I-826 if he wanted "to take a voluntary return back to his country so that he could leave immediately, or if he would want a hearing before an Immigration Judge." Garza said he would confirm that the individual could read and then give him a copy of the Form I-826 to review, "and while they're reading the form, I also explain each of the possible scenario[s] that he could take," as described on the form. He noted that there was an "x" on Rosario-Mijangos's Form I-826 next to the statement "Notice read by subject," which indicated that these procedures had been followed. After Rosario-Mijangos had been given an opportunity to read the form and ask any questions, Garza would have asked him which of the three options he wanted to select. He then would have circled the option Rosario-Mijangos picked and instructed him to write his initials inside the circle and to sign the form. Although Garza testified that he would have given Rosario-Mijangos five to ten minutes just to read the Form I-826 before making a decision, he also said that typically, if everything went smoothly, the entire process, including completion of both forms, took approximately five minutes in total.

III. Agent Mario A. Reyes's Testimony

The second border patrol agent to testify was Mario A. Reyes, whose signature appears on the September 4, 2007 Form I-826. Like Garza, Reyes testified that he did not remember Rosario-Mijangos, but he knew he prepared the Form I-826 because it bore his handwriting and his signature. Again like Garza, Reyes testified to his usual practices upon apprehension of an individual during the relevant time period. He said that after

8

arresting individuals thought to be in the United States illegally, he would transport them to the station. There, he and his fellow agents would collect the detainees' biographical information, which would then be recorded on the top of each individual's Form I-826.

Reyes testified that it was his practice to read to detainees the notice of rights printed on the Form I-826. That notice states:

> You have been detained because the Immigration Service believes that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States. If you request a hearing you may remain under custody or have the right to be released on bond until the date of the hearing. You have the option to request being returned to your country as soon as possible, without a hearing.
>
> You have the right to contact an attorney or other legal representative to represent you at the hearing or to answer any questions regarding your rights, as provided by the United States laws. Upon request, the officer who served you this Notice will provide you with a list of legal organizations that may represent you for free or at low cost. You have the right to communicate with the consular or diplomatic officers of your country. You may use the telephone to contact an attorney or other legal representative or a consular officer, at any time prior to your departure from the United States.

After reading this statement, Reyes would read the three options presented on the Form I-826 and answer any questions the detainees might have. Each detainee would then make his choice and initial and sign the form accordingly. Reyes testified that the form signed by Rosario-Mijangos indicated that this procedure had been followed, as it bore an "x" next to the statement, "Notice read to subject by Service Officer, in the Spanish language." Reyes further testified that another officer prepared a Form I-213 for Rosario-

Mijangos, that Rosario-Mijangos was fingerprinted and photographed, and that he did not know what happened to Rosario-Mijangos after he left the station.

IV.    The Immigration Judge's Findings

Following the hearing, on March 31, 2010, the IJ issued an oral decision. He found that Rosario-Mijangos, "was arrested . . . shortly after entering the United States without inspection, interviewed, photographed, and fingerprinted by DHS officials in connection with those arrests, and returned to Mexico under safeguards following his execution of a Notice of Rights and Request for Disposition (Form I-826), reflecting his acknowledgment of illegal presence, waiver of a hearing before an Immigration Judge, and request for immediate return to Mexico." The IJ acknowledged Rosario-Mijangos's testimony that he was not offered a hearing before an immigration judge, that he never had an opportunity to read either of the two I-826 forms, and that he was told on each occasion where to place his signature and initials. Nonetheless, the IJ credited the agents' testimony regarding their usual practices and determined that those practices had been followed in Rosario-Mijangos's case.

Relying on the agents' testimony and the documentary evidence, the IJ found that Rosario-Mijangos "was advised of his illegal status in the United States, his right to a hearing before an Immigration Judge, his right to contact an attorney to represent him at such a hearing, his right to communicate with a counselor or diplomatic official from his home country, and that he voluntarily elected and requested immediate return to his home country in lieu of a hearing." The IJ concluded that Rosario-Mijangos knowingly waived

10

these rights, choosing instead to return to Mexico, "not because he was uninformed or was unwilling, but because . . . his only goal was to get back to his family and home as soon as possible. And the most expeditious way to accomplish this, given his options, was to ask for voluntary return to Mexico and attempt to re-enter illegally . . . because to do otherwise might have subjected him to detention . . . 2000 miles away from his family and home."

Based on these factual findings, the IJ ruled that Rosario-Mijangos's August 30 and September 4, 2007 departures from the United States were pursuant to a formal documented process in which he was determined to be subject to removal, and were sufficient to terminate his continuous physical presence in the United States for purposes of 8 U.S.C. § 1229b(b)(1). He therefore held that Rosario-Mijangos was not eligible for cancellation of removal under that provision.

V.      Rosario-Mijangos's Administrative Appeals

On April 14, 2010, Rosario-Mijangos, through counsel, filed a notice of appeal to the BIA, arguing that the IJ had erred in holding that Rosario-Mijangos's continuous physical presence in the United States was interrupted by his encounters with the border patrol agents. The notice of appeal also alleged that the IJ's decision was erroneous because Rosario-Mijangos "did not knowingly and voluntarily waive his rights to removal proceedings, nor was he asked to do so, nor was he informed of such rights." Finally, Rosario-Mijangos marked "Yes" in response to the question, "Do you intend to

file a separate written brief or statement after filing this Notice of Appeal?" However, no brief was filed.

On March 31, 2011, the BIA dismissed the appeal. The BIA concluded that the IJ's factual findings were not clearly erroneous and agreed with the IJ's legal conclusion that Rosario-Mijangos "did not demonstrate statutory eligibility for cancellation of removal as he failed to establish the requisite 10 years of continuous physical presence." More specifically, the BIA held that Rosario-Mijangos's two encounters with border patrol agents, "during which time he was interviewed, photographed, fingerprinted, and advised of his rights before agreeing to a voluntary return to Mexico in lieu of an Immigration Court hearing," interrupted his physical presence for purposes of 8 U.S.C. § 1229b(b)(1), "as he was subjected to a formal documented process pursuant to which he was found to be inadmissible to the United States." On April 25, 2011, Rosario-Mijangos petitioned this Court for review of the BIA's decision.

While that petition was pending, on June 29, 2011, Rosario-Mijangos moved to reopen the immigration proceedings. Attached to the motion was a brief in support of Rosario-Mijangos's administrative appeal of the IJ's March 31, 2010 decision. Rosario-Mijangos asked the BIA to reopen the proceedings in order to consider the brief. In support of the motion, Rosario-Mijangos's attorney, who is not his counsel on this appeal, filed an affirmation acknowledging that she had not timely filed a brief in support of Rosario-Mijangos's appeal and stating that it was "difficult to explain why [she] did not finish and file the brief."

12

The BIA denied the motion to reopen on November 14, 2011. It held that Rosario-Mijangos had not submitted new evidence with the motion as required by 8 C.F.R. § 1003.2(c)(1), and that, to the extent Rosario-Mijangos sought reconsideration of the BIA's March 31, 2011 decision, his motion was untimely under 8 C.F.R. § 1003.2(b)(2). Finally, the BIA held that the case did not present an exceptional situation warranting sua sponte reopening under 8 C.F.R. § 1003.2(a) because even after reviewing Rosario-Mijangos's brief in support of his appeal, it was "not convinced that the respondent has established eligibility for cancellation of removal." On December 13, 2011, Rosario-Mijangos petitioned this Court for review of the BIA's November 14, 2011 decision. Rosario-Mijangos's petitions were consolidated on February 14, 2012.

## DISCUSSION

Rosario-Mijangos raises three issues on appeal. He argues, first, that the BIA erred in denying his motion to reopen. He contends that the agency proceedings should have been reopened because his attorney was ineffective when she failed to file a brief in support of his administrative appeal. Rosario-Mijangos acknowledges that in order to establish ineffective assistance of counsel, he must show that he was prejudiced by his lawyer's alleged shortcomings. He also acknowledges that the BIA reviewed the belatedly filed brief and concluded that it would not have affected its decision to dismiss his appeal. However, Rosario-Mijangos argues that he was nonetheless prejudiced by his counsel's ineffective assistance because he "may find his current appeal to this Court limited by a failure to adequately raise the issue before the administrative tribunal" under

13

8 U.S.C. § 1252(d)(1), which authorizes this court to review a final order of removal only if the petitioner has exhausted all administrative remedies available to him as of right. (Pet'r Br. 31-32.)

Rosario-Mijangos's remaining arguments echo those advanced in his untimely brief in support of his administrative appeal. First, Rosario-Mijangos challenges the IJ's factual findings, and in particular his conclusion that Rosario-Mijangos knowingly and intelligently waived his right to appear before an immigration judge. Second, Rosario-Mijangos argues that the IJ erred in holding, based on these factual findings, that Rosario-Mijangos's encounters with border patrol agents and his subsequent "voluntary returns" to Mexico constituted formal documented process sufficient to interrupt his continuous physical presence in the United States for purposes of 8 U.S.C. § 1229b(b)(1).

We hold that the BIA did not abuse its discretion when it accepted the IJ's factual findings, as those findings were supported by substantial evidence. In addition, we affirm the BIA's legal determination that Rosario-Mijangos's continuous physical presence in the United States was interrupted by the events of August 30 and September 4, 2007, and that he is therefore not eligible for cancellation of removal. Because we have considered and rejected all of Rosario-Mijangos's arguments on the merits, he has not been prejudiced by his attorney's failure to file a timely brief below. Accordingly, his appeal of the BIA's denial of his motion to reopen is denied.

I.     The Agency's Factual Findings

Rosario-Mijangos challenges the IJ's decision to credit the agents' testimony regarding their usual practices and the IJ's finding that those practices were followed throughout the agents' encounters with Rosario-Mijangos. Because the BIA adopted the factual findings of the IJ, we review the latter directly. See Lin Zhong v. U.S. Dep't of Justice, 480 F.3d 104, 116 (2d Cir. 2007). We apply a "substantial evidence" standard and uphold the IJ's factual findings if they are "supported by reasonable, substantial and probative evidence in the record." Yan Chen v. Gonzales, 417 F.3d 268, 271 (2d Cir. 2005) (internal quotation marks omitted).

The IJ's factual findings here are supported by sufficient evidence to satisfy that standard. The IJ concluded that Rosario-Mijangos knowingly and voluntarily signed two I-826 forms, thereby intelligently admitting his unauthorized presence in the United States, waiving his right to appear before an immigration judge, and electing to return to Mexico. This account of the events of August 30 and September 4, 2007 is consistent with and supported by Garza's and Reyes's testimony, and by the documentary evidence. Neither Garza nor Reyes specifically recalled their interactions with Rosario-Mijangos, but they testified in detail as to their usual practices, which in both cases involved reading the I-826 forms to detainees or allowing them an opportunity to read the forms themselves before selecting an option. The IJ found this testimony "credibl[e] and persuasive[]." Rosario-Mijangos contests this finding, but witness credibility is an issue for the agency, see Lin Zhong, 480 F.3d at 116, and its determination will not be

15

disturbed by this Court solely because of inessential discrepancies in the agents'

"generally consistent [and] rational" testimony, Diallo v. INS., 232 F.3d 279, 288 (2d Cir.

2000). Moreover, the IJ reasonably concluded that the documentary evidence supported

the agents' testimony. The markings on both I-826 forms indicated that Rosario-

Mijangos had read their contents, or had them read to him, and both bore his signature

and his initials.

Rosario-Mijangos also objects to the IJ's factual findings on the basis that they are

inconsistent with his own testimony, and in particular his averments that he was not

informed that he could see an immigration judge and was not given an opportunity to read

the I-826 forms before signing them. The IJ explicitly considered Rosario-Mijangos's

version of events and chose not to credit it to the extent it conflicted with the agents'

testimony. He explained, in part, that Rosario-Mijangos's claim that he had been

deprived of an opportunity to appear before an immigration judge was "discredited by his

own testimony that he never asked for a hearing and was never specifically told that he

could not have a hearing." Because it was reasonable for the IJ to accept the agents'

testimony, he was not required to believe Rosario-Mijangos's conflicting account. Nor

was he required, as Rosario-Mijangos suggests, to explicitly discredit each portion of the

testimony that he did not believe. See Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d

315, 341 (2d Cir. 2006) ("[An IJ] need not enumerate and evaluate on the record each

piece of evidence, item by item . . . ."); cf. Diallo, 232 F.3d at 288 ("[W]e cannot agree

16

with the petitioner that the BIA implicitly found his testimony credible or that its failure to make a negative assessment amounts to a finding of credibility.").

Accordingly, we find that the IJ's factual findings are supported by substantial evidence, and we accept those findings for the purpose of evaluating Rosario-Mijangos's legal arguments.

II.      The Agency's Legal Conclusions

The IJ concluded, and the BIA agreed, that Rosario-Mijangos was not eligible for cancellation of removal because his "voluntary returns" to Mexico following the August 30 and September 4, 2007 encounters with border patrol agents severed his continuous physical presence in the United States. We review this legal conclusion de novo, giving deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), to "the BIA's published, precedential interpretations of the Immigration and Nationality Act." Baraket v. Holder, 632 F.3d 56, 58 (2d Cir. 2011).

A.      Applicable Law

An alien seeking cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1) must show, inter alia, that he "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application." 8 U.S.C. § 1229b(b)(1)(A). The "continuous presence" requirement, however, does not demand actual uninterrupted physical presence in the United States. Rather, "[a]n alien shall be considered to have failed to maintain continuous physical presence in the United

17

States . . . if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days." Id. § 1229b(d)(2).

Rosario-Mijangos represents, and the government does not contest, that none of his absences from the United States exceeded 90 days, and that he had not been physically outside the United States for an aggregate of more than 180 days in the ten years before he was served with a notice to appear. However, the BIA held that his continuous physical presence was nevertheless severed by those voluntary returns under a time-stop rule established in the BIA's precedential opinion In re Romalez-Alcaide, 23 I. & N. Dec. 423, 425 (BIA 2002) (en banc).

Romalez-Alcaide was a Mexican citizen who had been residing illegally in the United States since 1984. In 1993, and again in 1994, he left the country under the threat of deportation for a period of one or two days pursuant to a statutory provision that no longer exists. That provision, former section 8 U.S.C. § 1252(b), provided that, in certain circumstances, deportation proceedings were not required "in the case of any alien who admits to belonging to a class of aliens who are deportable . . . if such alien voluntarily departs from the United States." Romalez-Alcaide, 23 I. & N. Dec. at 428 (internal quotation marks omitted). When Romalez-Alcaide applied for cancellation of removal in 1997, the BIA held that he was ineligible. It explained that, when Romalez-Alcaide voluntarily left the United States in 1993 and 1994 "under the threat of [immigration] proceedings" and "in lieu of being placed in proceedings," there could have been "no legitimate expectation by either of the parties that [he] could illegally reenter and resume

18

a period of continuous physical presence." Id. at 429. Accordingly, he could no longer

rely on time spent in the United States prior to those departures to satisfy the continuous

physical presence requirement. Id.[1]

Three years later, the BIA revisited Romalez-Alcaide in another precedential

opinion, In re Avilez-Nava, 23 I. & N. Dec. 799 (BIA 2005) (en banc). Avilez-Nava was

a Mexican citizen who had been residing illegally in the United States since 1986 and, in

removal proceedings against her in 2001, applied for cancellation of removal. Before the

IJ, she testified that she had returned to Mexico only once, in 1993. While attempting to

reenter the United States, Avilez-Nava was stopped by immigration authorities at the port

of entry, where she admitted to not having entry documents. She was then "taken to a

room where a man explained [the denial of entry, and] was then escorted to a door 'back

across the border.'" Id. at 800. The government offered no record of the encounter. The

BIA held that Avilez-Nava's interactions with immigration authorities did not sever her

continuous physical presence under Romalez-Alcaide because she was not "formally

excluded or made subject to an order of expedited removal, . . . offered and accepted the

opportunity to withdraw an application for admission, or . . . subjected to some other

---

[1] In reaching its holding, the BIA relied heavily on the Attorney General's interpretation of the requirements for special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act, which largely mirror those for cancellation of removal under 8 U.S.C. § 1229b, including a seven- or ten-year period of continuous physical presence. See Romalez-Alcaide, 23 I. & N. Dec. at 427. In that context, the Attorney General has provided that "a period of continuous physical presence is terminated whenever an alien . . . has voluntarily departed [from the United States] under the threat of deportation." 8 C.F.R. § 240.64(b)(3), quoted in Romalez-Alcaide, 23 I. &. N. Dec. at 428.

formal, documented process pursuant to which [she] was determined to be inadmissible to the United States." Id. at 800-01.

The BIA explained that Avilez-Nava's return to Mexico, unlike that of Romalez-Alcaide, "was not a voluntary departure from the United States to which she agreed in order to avoid the commencement of removal proceedings." Id. at 804 n.5. She "was not made aware of the opportunity for exclusion proceedings" and simply complied with an agent's directive to return to Mexico. Id. at 805. Her encounter with agents at the border was so brief and informal that the government produced no evidence of it. Accordingly, the BIA found no evidence that Avilez-Nava "was subjected to any . . . formal, documented process pursuant to which [she] was determined to be inadmissible to the United States." Id. at 805-06. It stated that relevant evidence of such a process might "include testimony or documentary evidence of a legally enforced refusal of admission and return such as a Record of Deportable/Inadmissible Alien (Form I-213), a Notice of Action – Voluntary Departure (Form I-210), an IDENT printout, affidavits or statements of the alien or immigration officials, photographs, fingerprints, or other appropriate forms and official records of the DHS." Id. at 806.

We have previously considered the BIA's decisions in Romalez-Alcaide and Avilez-Nava. In Ascencio-Rodriguez v. Holder, we held that "the BIA's interpretation of the cancellation of removal statute expressed in both of these decisions is reasonable and is entitled to Chevron deference." 595 F.3d at 112. Accordingly, we are bound by the BIA's decisions, and the question before us is whether Rosario-Mijangos was subjected

20

in the summer of 2007 to a "formal, documented process pursuant to which [he] was determined to be inadmissible to the United States." Avilez-Nava, 23 I. & N. Dec. at 805-06. If so, we must affirm the BIA's holding that he is not eligible for cancellation of removal under 8 U.S.C. § 1229b(b).

B.    Application

We hold that when Rosario-Mijangos returned to Mexico on August 30 and September 4, 2007, he did so pursuant to formal, documented process through which he was determined to be inadmissible, and his "voluntary returns" therefore broke his continuous presence in the United States. During each encounter with immigration officials, Rosario-Mijangos was informed that he was believed to be in the United States illegally and that he had the right to contact an attorney and the right to a hearing before an immigration judge. On each occasion, he admitted that he was in the United States illegally, he waived his right to appear before a judge, and he elected to return to Mexico. Accordingly, Rosario-Mijangos "le[ft] with the knowledge that he d[id] so in lieu of being placed in proceedings," Romalez-Alcaide, 23 I. & N. Dec. at 429, and after making "an admission to facts that rendered him inadmissible," Ascencio-Rodriguez, 595 F.3d at 113. Moreover, Rosario-Mijangos's two encounters with the border patrol were well documented, evidenced by fingerprints and photographs, forms I-213 and I-826, an IDENT printout, and the testimony of two agents – in other words, precisely the type of evidence that the BIA has identified as probative in determining whether a formal process

21

occurred. Finally, the agency found, and we discern, no governmental impropriety or bad faith in connection with the formal process here.

Rosario-Mijangos argues that he was not subject to a formal process because "voluntary return" is not provided for by statute or regulation. He contends that it is therefore a nullity that cannot legally affect his status. However, Rosario-Mijangos has identified nothing in Avilez-Nava to suggest that "formal process" refers only to procedures specifically contemplated by statute or regulation. Indeed, the decision suggests the opposite. Since it is well established that voluntary departure under the threat of deportation severs continuous physical presence, the BIA in Avilez-Nava was simply calling for a process to document a similar choice made by illegal entrants intercepted at the border who waive their right to proceedings before an immigration judge, concede their inadmissibility, and return voluntarily back across the border. A formalized process is necessary to avoid depriving "otherwise eligible respondents from cancellation of removal on the basis of uncertain evidence and speculation as to what occurred during a particular encounter at a port of entry." Avilez-Nava, 23 I. & N. Dec. at 806.

Hence, the BIA held that an immigration official's refusal to admit an alien at a land border port of entry will not constitute a break in the alien's continuous physical presence unless there is evidence that the alien "was formally excluded or made subject to an order of expedited removal, was offered and accepted the opportunity to withdraw his or her application for admission, *or was subjected to any other formal, documented*

22

*process* pursuant to which the alien was determined to be inadmissible to the United States." Id. at 805-06 (emphasis added). This holding cannot logically be limited to procedures authorized by statute or regulation, as Rosario-Mijangos has not identified any such procedures to which the residual clause of the BIA's holding might apply. The parties, in their briefing to this court, purport to list all the ways that an alien might be removed or refused admission; all of them, other than the "voluntary return" practice at issue in this case, constitute formal exclusion or expedited removal, or withdrawal of an application for admission.[2] Thus, the "voluntary return" process by which Rosario-Mijangos was deemed inadmissible not only precisely fits the criteria listed by the BIA in Avilez-Nava for identifying "other formal, documented process[es]" that suffice to break continuity of presence, but seems to be the only practice that exists to which that phrase could apply.

Finally, we note that our holding is consistent with those of the other circuits that have considered Avilez-Nava's application to "voluntary return" procedures similar to those at issue here. See Barrera-Quintero v. Holder, 699 F.3d 1239, 1241, 1246 (10th Cir. 2012) (continuous presence broken where alien returned to Mexico after knowingly and

---

[2] See 8 U.S.C. § 1187(b) (removal of an alien admitted under the visa waiver program); id. § 1225(a)(4) (withdrawal of an application for admission); id. § 1225(b)(1)(A)(i) (expedited removal for certain inadmissible applicants for admission); id. § 1228 (expedited removal for aliens convicted of aggravated felonies); id. § 1228(c)(1) (judicial removal ordered by a federal district court); id. § 1229a (entry of removal order following removal proceedings before an immigration court); id. § 1229c(a)(1) (pre-hearing grant of voluntary departure); id. § 1231(a)(5) (reinstatement of a prior order of removal).

23

voluntarily signing a Form I-826); <u>Reyes-Sanchez v. Holder</u>, 646 F.3d 493, 499 (7th Cir. 2011) (continuous presence interrupted where alien "was taken into custody; she was fingerprinted; . . . forms were filled out documenting her apprehension[; she] was given a Form I-826," and she elected to return to Mexico); <u>Flores-Flores v. Holder</u>, 441 F. App'x 418, 418 (9th Cir. 2011) (unpublished) (alien "did not meet the continuous physical presence requirement where the record contains a Form I-826 . . . which indicates that Flores-Flores knowingly and voluntarily accepted voluntary departure"). We join these courts in holding that "voluntary return" procedures may be sufficiently formal and documented to result in the termination of an alien's continuous physical presence in the United States. We further hold that in this case, they were sufficiently formal and documented, and that Rosario-Mijangos is therefore ineligible for cancellation of removal.

## CONCLUSION

For the foregoing reasons, Rosario-Mijangos's petition for review of the BIA's March 31, 2011 decision finding him ineligible for cancellation of removal is DENIED, as is his petition for review of the BIA's November 14, 2011 denial of his motion to reopen.

24